(No. 77051

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANGELO RIVERA, Appellant.

*Opinion filed June 22, 1995.*

Rita A. Fry, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb, Theodore Fotios Burtzos, Susan Schierl and Sheila McGinnis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

Following a second trial in the circuit court of Cook County, a jury convicted defendant, Angelo Rivera, of the first degree murder of Zelia Simmons. Defendant was subsequently sentenced to an extended term of 80 years' imprisonment. The appellate court affirmed the circuit court's judgment (No. 1—92—1613 (unpublished order under Supreme Court Rule 23)), and we allowed defendant's petition for leave to appeal (145 Ill. 2d R. 315). Defendant now raises three issues for our review: (1) whether the uncorroborated testimony of an accomplice was sufficient to prove defendant guilty beyond a

reasonable doubt; (2) whether the trial court erred in failing to admonish the jury that the accomplice jury instruction (Illinois Pattern Jury Instructions, Criminal, No. 3.17 (3d ed. 1992) (hereinafter IPI Criminal 3d No. 3.17)) applies only to the State's witness and not to the defendant's witness; and (3) whether the defendant's sentence was unconstitutionally increased following his second trial from 60 to 80 years' imprisonment, based on aggravating factors occurring between the two trials. For the reasons which follow, we affirm.

This case has an extensive history. Originally, defendant was convicted of murder following a bench trial and sentenced to 60 years in prison. On direct appeal, the appellate court affirmed defendant's conviction. (165 Ill. App. 3d 1158 (unpublished order under Supreme Court Rule 23).) However, defendant's first degree murder conviction and 60-year sentence were reversed by the Federal court of appeals, which granted defendant *habeas corpus* relief and remanded the cause for a new trial. *Rivera v. Director, Department of Corrections* (7th Cir. 1990), 915 F.2d 280.

At the second trial, the evidence showed that during the early morning hours of February 10, 1985, the victim's body was discovered by Chicago Police Officers Scott Alberts and Paul La Rosa in an alley in Chicago. The officers observed a trail of blood leading from the victim's body and followed this trail to the apartment of codefendant Richard Norman. The officers further observed a large amount of blood at the entry of the apartment, peered in and noticed that the living area was in disarray and covered in blood.

At this time, outside Norman's apartment, a neighbor, Beverly Besser, told one of the officers that she had seen Norman helping a woman who had fallen in the snow around 3 a.m. The police then arrested Norman, and he confessed that same evening. In his confession,

Norman stated that he alone had beaten the victim in his apartment the previous evening.

During the course of their investigation, the police discovered that defendant and Jeff Meger were also present in the apartment with Norman during some portion of the night. On the evening Norman confessed, Meger gave a court-reported statement in which he told the police he saw Norman hit the victim with his fists. Meger did not implicate defendant. In addition, Meger testified before a grand jury, naming only Norman. Norman was eventually convicted and sentenced to a term of natural life imprisonment.

Two days after his grand jury appearance, Meger implicated defendant in the murder. Meger informed the police that he saw defendant pick up a headless hammer and hit the victim with it. After speaking with Meger, the police brought defendant to the police station for questioning. Detective Thezan and his partner read defendant his *Miranda* rights and began questioning him concerning the murder. At defendant's trial, Thezan testified that during the course of their interview, defendant indicated that on the night in question, he and Meger were at Norman's basement apartment when Norman arrived with the victim. During the questioning, defendant informed Thezan that Norman suggested that they have sexual relations with the victim, but he declined. Defendant mentioned that later, he entered the apartment bedroom area and saw Norman in bed with the victim.

After questioning defendant, Thezan took Meger into defendant's interview room where Meger gave his account of the events leading to the murder, including defendant's participation in the murder, in the presence of defendant. Detective Thezan testified that thereafter, defendant gave a different version of the events. In his second version, defendant claimed that he heard a

thumping sound coming from the bedroom and when he went to check on what it was, he saw Norman standing above the woman hitting her with a two-by-four. According to defendant, he and Meger then left the apartment separately, and later ran into each other at the Golden Nugget Restaurant. Shortly after speaking with the police, defendant was arrested.

By the time defendant's second trial occurred, Meger had died, and his testimony at defendant's first trial was presented by a reading of the trial transcript to the jury. Meger, a twice-convicted felon, stated in relevant part that he, defendant, and Norman were drinking at Norman's apartment on the night of the murder. Meger testified that when they ran out of beer, defendant and Norman went to Shirley's Bar to get more beer. Meger stated that defendant returned first, carrying the beer, followed by Norman, who was accompanied by the victim. According to Meger, the victim sat on a bed in the basement and Norman sat on one side of her while defendant sat on her other side. Meger further testified that the victim appeared to be "high" and began to partially disrobe with Norman assisting her. At this point, Meger claimed that defendant said something to the effect that he was going to engage in sex with the victim. Meger also recalled that Norman tried to get on top of the victim, but she pushed him away. According to Meger, after the victim resisted, Norman hit the woman several times with his fists, and then with a board.

Meger claimed that he grabbed Norman, pulling him away, only to see defendant strike the victim two or three times on the head with a hammer handle. Meger asserted that he also stopped the defendant, but then told him that "he was gone" and left for approximately 20 minutes. When Meger returned, he saw the victim's body and noted that there was a lot of blood on the mat-

tress and pillow. Meger recalled that both defendant and Norman were still in the basement, and Norman dragged the body out of the basement towards the gangway.

Meger stated that he and defendant then went to the Golden Nugget Restaurant. Meger maintained that on the way to the restaurant, defendant told him that if he said anything about what happened something would happen to him. Meger interpreted this warning to mean that he might be killed. Meger testified that when he spoke to the police the day after the murder, he revealed nothing about defendant's involvement due to the threats defendant made against him. It was only after defendant was in custody that Meger implicated him for the murder, in his presence at the police station.

In contrast to Meger's testimony, at defendant's second trial, Norman claimed that he acted alone in the murder of the victim. Norman testified that on the night in question, when the men ran out of beer, he went to Shirley's and was told by the bartender that he could have more beer for free if he would remove the highly intoxicated victim from the bar. Norman indicated that he agreed to this proposition, and dragged the victim to his apartment. Norman stated that the victim took off her blouse while sitting on a bed. Norman recalled that defendant and Meger then went into the kitchen. According to Norman, defendant came back out and stated that he was leaving and shortly thereafter Meger came out of the kitchen to inform Norman that defendant had left.

Norman recounted that at some point he just "snapped" and began hitting the victim in the head with a hammer. Norman claimed that Meger came into the room, grabbed the hammer and threw it, so Norman began striking the victim with a crowbar. According to Norman, Meger also grabbed the crowbar and threw it

down, so Norman began striking the woman with another object. At this point, Norman claimed that the victim was dead, and he and Meger wrapped her in carpet and took her out to a gangway. Throughout his testimony, Norman maintained that defendant had left the apartment before he began striking the victim.

On cross-examination, the State presented Norman's testimony from his own trial. At his murder trial, Norman testified that he did not participate in the beating of the victim, and he implicated Meger and defendant in her murder. When Norman was questioned about his prior testimony from his own murder trial, he explained that he had repeatedly lied at his own trial when he implicated Meger and defendant in the murder. Norman indicated that he lied to his own jury because he was trying to avoid conviction. Norman further acknowledged that at his own trial, the oath to tell the truth meant nothing to him. At his own trial, Norman testified that he went to the bathroom to inject himself with cocaine and heroin, and when he returned, defendant struck the victim on the back with some object. At his trial, Norman claimed that he never hit the victim with a crowbar or hammer and that he only hit her in the face with his fists.

Evidence of the nature and extent of the victim's injuries was also presented at defendant's trial. Forensic pathologist Dr. Robert Kirschner testified that the victim sustained over 50 areas of recent trauma, including 22 separate external injuries to her head and face. Dr. Kirschner further revealed that the victim sustained abrasions, linear lacerations, and contusions on her neck, shoulders, chest, abdomen, lower back, buttocks, and legs. Dr. Kirschner concluded that the victim had been struck at least a half dozen times in the head and that the force of the blows basically split the victim's skull open.

Prior to deliberations, the trial court instructed the jury to cautiously consider the testimony of an accomplice as outlined in IPI Criminal 3d No. 3.17. The trial court refused to limit this instruction to only Meger, the State's witness. The jury found the defendant guilty of murder. The trial judge sentenced defendant to an extended term of 80 years' imprisonment. The trial judge indicated that the increased sentence was due to two weapons offenses defendant committed while in prison awaiting his second trial.

As grounds for reversing his conviction, defendant first argues that he was convicted based on the uncorroborated testimony of Meger, his accomplice, and that uncorroborated accomplice testimony is insufficient to establish guilt beyond a reasonable doubt. This argument is untenable. In *People v. Collins* (1985), 106 Ill. 2d 237, 261, this court specifically held that the testimony of an accomplice is sufficient to sustain a conviction if it satisfies the jury of the defendant's guilt beyond a reasonable doubt. According to *Collins*, when presented with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. (*Collins*, 106 Ill. 2d at 261.) But rather, the test to be employed on review " 'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

Defendant claims that even under this reasonable doubt test, the evidence against him was insufficient to support a conviction. Defendant argues that he was not proved guilty beyond a reasonable doubt because his conviction was based solely on Jeff Meger's prior testimony. Defendant insists that Meger's testimony

was impeached by his two felony convictions and contradicted by Norman's trial testimony.

There is no question that the State's critical evidence linking defendant to the murder was the testimony of Jeff Meger. Meger had died prior to defendant's second trial and his testimony was presented to the jury by a reading of the trial transcript. Basically, the jury was presented with the choice of accepting Meger's version of the events given at defendant's first trial or the testimony Norman gave at defendant's second trial.

Defendant maintains that because Meger's accomplice testimony was contradicted by the accomplice testimony of Norman, no rational trier of fact could have found defendant guilty beyond a reasonable doubt. Defendant relies on *People v. Newell* (1984), 103 Ill. 2d 465, 471, which holds that "where the only evidence is the testimony of three accomplices, all convicted felons, one of whom says defendant is guilty and two of whom say he is not, with no corroboration of either view, we simply cannot say there has been proof of guilt beyond a reasonable doubt." (Emphasis omitted.) *Newell*, however, was a very fact-specific case in which the one accomplice who implicated defendant testified under immunity, and his testimony was wholly uncorroborated and directly contradicted by two other accomplices. *Newell*, 103 Ill. 2d at 471.

The circumstances here are quite different. Meger testified that the defendant and Norman were preparing to have sex with the highly intoxicated victim, and when she resisted, Norman began striking her with his fists and then with a board. Meger stated that when he was able to stop Norman, defendant started striking the woman two or three times with a hammer handle. Although Meger was a twice convicted felon and did not implicate defendant in his original statement, he explained that he originally feared that defendant would

harm him if he mentioned what he knew. Meger maintained that only after defendant was taken into custody was he willing to reveal defendant's involvement. Moreover, Meger confronted defendant at the police station in defendant's interview room, and disclosed defendant's involvement in the murder.

Norman, for his part, was a convicted murderer and admitted perjurer. Norman was repeatedly impeached by the testimony he gave, under oath at his own trial, which was completely inconsistent with his testimony at defendant's trial. In addition to being inconsistent with his testimony from his own murder trial, Norman's testimony failed to account for the numerous injuries the victim sustained all over her body. Norman testified that he alone hit the victim with a hammer, crowbar, and a third object, and that Meger struggled to grab each object out of his hands and throw it to the ground. Norman's testimony does not explain how the victim would have received the abrasions, linear lacerations, and contusions on her neck, shoulders, chest, abdomen, lower back, buttocks, and legs as testified to by forensic pathologist Dr. Robert Kirschner. The few blows Norman admitted inflicting, while Meger struggled to prevent the beating, would not account for the 50 areas of recent trauma the victim suffered on the night in question.

In addition to Meger's testimony of defendant's guilt, Norman's prior testimony from his own murder trial was admitted as substantive evidence of defendant's guilt. That testimony implicated defendant in the murder and corroborates Meger's version of the events. Section 115—10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—10.1 (West 1992)) allows the prior inconsistent statements of a witness to be admitted as substantive evidence against a defendant when specific criteria are met. It provides in relevant part:

"In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other · proceeding ***." 725 ILCS 5/115—10.1 (West 1992).

Norman's prior testimony at his own murder trial clearly falls within the criteria of section 115—10.1 and was admissible as substantive evidence of defendant's guilt. Norman's prior testimony was made under oath at his own murder trial and it was completely inconsistent with the testimony he gave at defendant's trial. At Norman's own trial, he maintained that defendant repeatedly struck the victim, killing her. In contrast, at defendant's trial, Norman claimed that defendant left the apartment and had no involvement in the victim's murder. Furthermore, Norman was subject to cross-examination regarding this prior inconsistent statement as contemplated under the statute. Norman was given ample opportunity at trial to explain or to deny the prior statement made at his own trial. Norman was called as a defense witness and as such was not subject to cross-examination by the defendant. However, on redirect by the defendant, Norman was asked several questions which allowed him to explain his prior inconsistent statement. The trial judge even allowed re-redirect by defense counsel during Norman's testimony.

Moreover, a prior inconsistent statement, similar to the one in question in this case, was admitted as substantive evidence in *People v. Young* (1988), 170 Ill. App. 3d 969. In *Young*, a codefendant testified on behalf of the defendant as to his innocence, but the codefendant had made prior statements to the police implicating the defendant in the crime. In *Young*, the codefen-

dant's prior inconsistent statements were held to be admissible as substantive evidence of the defendant's guilt under section 115—10.1. (*Young*, 170 Ill. App. 3d at 977-81.) The *Young* case is consistent with our interpretation of that statute. We find that Norman's trial testimony from his own murder trial falls within the criteria of the statute and was properly used as substantive evidence of defendant's guilt.

After viewing the evidence in a light most favorable to the prosecution, we conclude that Meger's testimony, Dr. Kirschner's medical testimony, and Norman's previous trial testimony amounted to sufficient evidence to support the jury's verdict. In this case, the resolution of defendant's guilt or innocence simply depended on whose testimony the jury believed. As previously stated, the credibility of the witnesses and the weight to be given their testimony are determinations exclusively within the province of the jury. (*People v. Ellis* (1978), 74 Ill. 2d 489, 496.) The jury accepted the State's version of the events and we find that a rational trier of fact could have found defendant guilty beyond a reasonable doubt.

Defendant next contends that the trial court erred in failing to admonish the jury that the accomplice jury instruction, IPI Criminal 3d No. 3.17, applied only to Meger, the State's witness, and not Norman, defendant's witness. At the close of the trial, the trial court gave the jury the following instruction:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in the light of the other evidence in the case." (IPI Criminal 3d No. 3.17.)

At the instructions conference, defense counsel requested the trial court to admonish the jury that this accomplice instruction should only be applied to the

testimony of Meger, the State's witness. The trial court refused to limit the instruction, stating that it would not factually limit an instruction and that both sides could make whatever benefit of the instruction they wanted.

Defendant claims that the court's refusal to limit the instruction denied him a fair trial under the due process clauses of the Illinois and United States Constitutions. In support, defendant points to the committee notes to the accomplice instruction and several Illinois appellate court cases which state that the "instruction applies only to a witness who testifies for the State." (IPI Criminal 3d No. 3.17, Committee Note.) Defendant notes that the purpose of the accomplice instruction was to afford greater protection to the defendant and caution the jury that a State's witness' testimony may be influenced by the promise of leniency. *People v. Hanson* (1980), 83 Ill. App. 3d 1108, 1112.

However, we see no reason why the testimony of Meger, the State's witness, should have been scrutinized more carefully than the testimony of Norman, defendant's witness. In the most recent case in which this court addressed this same issue, it determined that an accomplice's testimony should be cautiously scrutinized regardless of which side he testifies for. (*People v. Touhy* (1935), 361 Ill. 332, 352-53.) In *Touhy*, the defendant argued that the accomplice instruction in effect at that time, which cautioned that the testimony of an accomplice should be acted upon with great caution, should only be applied to accomplices called by the State. (*Touhy*, 361 Ill. at 352-53.) In response to the defendant's request to limit the instruction to State witnesses only, the court held that, "No reason is advanced, and none is apparent, why one who is in fact an accomplice should not have his testimony scrutinized carefully before it is relied on, no matter on which side of the case he testified." *Touhy*, 361 Ill. at 353.

We continue to adhere to this court's position in *Touhy*. We can think of no reason why codefendant Norman's testimony should not be scrutinized as cautiously and strictly as Meger's testimony. Norman was a convicted murderer and admitted perjurer, and his testimony at Rivera's trial was inconsistent with his prior testimony at his own trial. Norman's credibility was clearly suspect, and in such a case, the trial judge should have discretion to decide whether to advise the jury to accept an accomplice's testimony with caution. The trial court, therefore, did not err in refusing to limit the accomplice instruction to Meger.

Finally, defendant contends that his sentence was unconstitutionally increased from 60 to 80 years' imprisonment following his second trial, based on aggravating factors occurring between the two trials. Defendant argues that the 20-year increase in his sentence must be viewed as a violation of his due process rights, because it punishes him for advancing his appellate rights and his right to a jury trial at his second trial.

At defendant's sentencing hearing, the court was advised that while defendant was incarcerated between his first and second trials, he was convicted of unlawful use of a weapon in a penal institution. For this offense, defendant received a five-year sentence to run consecutive to the 60-year term imposed upon his first conviction. The court was also informed that subsequent to the weapons conviction, several shanks were found by prison authorities in defendant's cell. For this second weapons violation, defendant was punished administratively by loss of good time and placement in segregation. In imposing sentence, the trial court commented that defendant's crime was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The trial court also indicated that it took into account the subsequent criminal activity of defendant

while he was incarcerated between his trials, in increasing defendant's sentence to 80 years. The trial court further noted that this was an appropriate case for an increase in sentence pursuant to the United States Supreme Court decision in *Texas v. McCullough* (1986), 475 U.S. 134, 89 L. Ed. 2d 104, 106 S. Ct. 976.

We hold that the trial court could properly increase defendant's sentence based on defendant's weapons violations occurring subsequent to his original sentencing. In *North Carolina v. Pearce* (1969), 395 U.S. 711, 723-24, 23 L. Ed. 2d 656, 668, 89 S. Ct. 2072, 2079-80, the United States Supreme Court held that increased sentences imposed after retrial are not barred by the double jeopardy or equal protection clauses unless such increased sentences are motivated by vindictive retaliation by the trial judge. The Court in *Pearce* reasoned that: "A trial judge is not constitutionally precluded, in other words, from imposing a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities.' *Williams v. New York*, 337 U.S. 241, 245." (*Pearce*, 395 U.S. at 723, 23 L. Ed. 2d at 668, 89 S. Ct. at 2079.) The Court in *Pearce* further reasoned that "[s]uch information may come to the judge's attention from evidence adduced at the second trial itself, from a new presentence investigation, from the defendant's prison record, or possibly from other sources." *Pearce*, 395 U.S. at 723, 23 L. Ed. 2d at 668, 89 S. Ct. at 2079.

This court followed *Pearce* in *People v. Baze* (1969), 43 Ill. 2d 298, 302, reasoning that an "increased sentence on retrial does not offend the constitutional guarantee against double jeopardy where the original conviction is set aside at defendant's behest and credit is given for time served." The court further held that an increased

sentence after retrial may be proper if the court is able to point to specific conduct on the part of defendants occurring subsequent to their original sentencing, which warrants a heavier sentence. (See *Baze*, 43 Ill. 2d at 303.) In addition, in 1973, the Illinois legislature incorporated the *Pearce* and *Baze* decisions when it enacted section 5—5—4, which provides that:

> "Where a conviction or sentence has been set aside on direct review or on collateral attack, the court shall not impose a new sentence for the same offense or for a different offense based on the same conduct which is more severe than the prior sentence less the portion of the prior sentence previously satisfied unless the more severe sentence is based upon conduct on the part of the defendant occurring after the original sentencing." 730 ILCS 5/5—5—4 (West 1992).

We hold that this was an appropriate case for an increase in sentence pursuant to *Baze* and section 5—5—4. At the sentencing hearing, the court noted that defendant's weapons offenses, which occurred between his two trials, had to be taken into account when considering the length of sentence which should be imposed. Under *Baze*, defendant's weapons violations were clearly legitimate matters for the trial court to consider in imposing an increased sentence. In fact, the Court in *Pearce* specifically stated that a defendant's prison record subsequent to the first trial was the type of conduct that a court should take into account when imposing a new sentence. *Pearce*, 395 U.S. at 722-23, 23 L. Ed. 2d at 667-68, 89 S. Ct. at 2079.

Furthermore, there is not the slightest bit of evidence in the record to support defendant's claim of vindictiveness by the sentencing judge. It appears in the record that the court based its decision to increase defendant's sentence by 20 years on defendant's subsequent weapons offenses. These were proper matters for the trial judge to consider when redetermining defendant's sentence.

For the aforesaid reasons, the judgment of the appellate court is affirmed.

*Judgment affirmed.*