No. 2--95--0663

_________________________________________________________________

                                  IN THE

                        APPELLATE COURT OF ILLINOIS

                              SECOND DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE OF           )  Appeal from the Circuit Court

ILLINOIS,                            )  of Kane County.

                                     )

     Plaintiff-Appellee,             )

                                     )

     v.                              )  No. 90--CF--100

                                     )

TRACY TAYLOR,                        )  Honorable

                                     )  James T. Doyle

     Defendant-Appellant.            )  Judge, Presiding.

_________________________________________________________________

     JUSTICE RATHJE delivered the opinion of the court:

     Following a jury trial, the defendant, Tracy Taylor, was

convicted of one count of aggravated criminal sexual assault and

was sentenced to a term of 30 years' imprisonment in the Department

of Corrections.  The defendant appealed, and this court reversed

his conviction and remanded the cause for a new trial.  See People

v. Taylor, 244 Ill. App. 3d 460 (1993).  Following a second jury

trial, the defendant was again convicted of aggravated criminal

sexual assault and was sentenced to a term of 35 years'

imprisonment.  

     The defendant appeals raising the following issues:  whether

the trial judge should have recused himself from all proceedings

which occurred after the jury began deliberations; and whether the

increase in the defendant's sentence from 30 to 35 years'

imprisonment was improper.

     On October 11, 1994, following the defendant's second

conviction, the trial court held a sentencing hearing.  The State

called several witnesses to testify in aggravation.

     Susan Dahl testified that, on January 18, 1990, she was

working as a clerk in a convenience store when the defendant robbed

the store.  In the course of the robbery, the defendant slapped her

in the face and told her that he had a gun.

     Cameron Forbes, employed by the Illinois Department of

Corrections in the records department, testified as to the

defendant's penitentiary records for the time period between his

two trials in this cause.  Mr. Forbes explained that an inmate

disciplinary report is referred to as a "ticket."  There are major

tickets which would be for something like assaultive behavior while

a minor ticket would be for not reporting for school or being slow

in locking up.  Minor tickets are sent to the program unit which is

limited to enforcing minor discipline.  Major tickets are sent to

the adjustment committee which has the latitude to dismiss the

ticket or impose a proper punishment following a hearing.  A major

ticket would be any ticket where an inmate received a C grade

demotion, a segregation placement, or a loss of good-conduct

credits for the violation.

     Mr. Forbes further testified that the records reflect that the

defendant received one major ticket in his first six months of

incarceration and nine thereafter.  He also received 12 minor

tickets during his incarceration.  The records further reflected

that the defendant lost good-time credits on two occasions. 

According to Forbes, of the major tickets the defendant received,

it appeared that at least two were for assaultive behavior.  

     On cross-examination, Mr. Forbes testified that neither of the

two incidents of assaultive behavior were directed against a

correctional officer.  He acknowledged that there was gang activity

at the Menard facility, to which the defendant had been transferred

from the Joliet facility, but denied that the gangs had more

control over the day-to-day activities of the inmates than the

guards.  He further denied that fighting was very common at Menard

or Joliet.  Mr. Forbes acknowledged that the good-time credits that

the defendant lost as a result of those incidents were in fact

restored to him as of January 22, 1992.  

     Mr. Forbes further testified that other "major" tickets that

the defendant received were for giving extra meat to another inmate

while the defendant was on the serving line; failing to complete an

assigned detail; and being in a cell with another inmate where

music was being played too loud.  However, Mr. Forbes was unsure as

to whether all these were included as major tickets in his total of

nine for the defendant since in certain cases a minor punishment

was imposed.  Mr. Forbes did agree that the defendant had only been

involved in two incidents of assaultive behavior since his

incarceration.  

     Mr. Forbes further testified that the defendant's records

showed no violations from November 1992 to November 1993 when he

was returned to the Kane County jail to await his new trial.  In

addition, the records reflected that the defendant had received a

"low risk" status and had been recommended by the warden for

transfer to a less secure facility.  The transfer was denied solely

on the basis of the amount of time remaining to be served on the

defendant's sentence.  

     On redirect examination, Mr. Forbes testified that, in one of 

the assault incidents, the defendant and two others jumped another

inmate and began to beat him up.  The defendant was also "ticketed"

for stealing syrup, which the inmates would use to make alcohol.  

On re-cross-examination, Mr. Forbes testified that no criminal

charges were placed against the defendant while he was in the

Department of Corrections.  

     The trial court then questioned Mr. Forbes as to why the 30

days of good-time credit that the defendant lost as a result of the

above assault incident were restored to him.  Mr. Forbes explained

that, under Department of Corrections' procedures, after a certain

period of time has elapsed without similar conduct occurring, the

good-time credit lost is restored to the inmate, unless the time

was lost in conjunction with an escape in which case it is not

restored.  

     Thomas Oatman testified that the victim and he were living

together at the time of the offense; they are now married.  He

described the impact that the offense had on his working life as

well as on the victim and their social life.  At the time that the

cause was remanded for a second trial, the victim received eight

obscene telephone calls.  The calls were traced to the Department

of Corrections facility at Danville.  Mr. Oatman denied knowing

anyone at the Danville facility or that he gave anyone at the

Danville facility his telephone number.  

     On cross-examination, Mr. Oatman acknowledged that he had a

published telephone number.  

     The defense then called Stacy Taylor, the defendant's brother,

and Marcia Green, the defendant's mother, to provide testimony in

mitigation.

     In argument following the testimony, the State urged the trial

court to impose a longer sentence than had been originally imposed

on the defendant based upon his conduct while incarcerated in the

Department of Corrections.  The defense responded that the original

trial judge had found that the defendant was not subject to an

extended-term sentence and instead had imposed the maximum

nonextended-term sentence of 30 years' imprisonment on the

defendant.  Therefore, under the resentencing statute, the

defendant's new sentence could not exceed the original sentence. 

The defense further argued that the incidents that the defendant

was involved in while he was incarcerated were for the most part

minor and occurred early in his incarceration.

     In pronouncing sentence, the trial judge stated that the

offense in this cause was the most brutal of its type that he had

ever heard or seen.  He specifically found that, based upon the

testimony and the evidence, the offense here was accompanied by

exceptionally brutal behavior and was indicative of wanton cruelty. 

The trial judge further found no basis for reducing the original

sentence of 30 years' imprisonment.  Citing the testimony regarding

the defendant's conduct during his incarceration, the trial court

found that he could impose a higher sentence than the original 30-

year sentence.  After considering the factors in aggravation and

balancing them with the factors in mitigation, the trial court

imposed a sentence of 35 years' imprisonment in the Department of

Corrections.  

     On November 10, 1994, the defendant filed a motion to reduce

his sentence.  Inter alia, the motion alleged that the defendant's

rights to due process were violated when the trial judge

(hereinafter Judge Doyle) engaged in conversation with the victim's

family during jury deliberations at the defendant's second trial. 

The motion further alleged that the violation was compounded by the

fact that Thomas Oatman, one of the family members, subsequently

testified at the defendant's sentencing hearing.  The defendant

also filed an addition to his motion for a new trial, which had

already been denied on October 11, 1994, alleging the same due

process violation.  The case was transferred to Judge Barry Puklin

for a hearing on those particular allegations.

     On May 5, 1995, a hearing was conducted by Judge Puklin on the

motion to reduce sentence and the addition to the motion for a new

trial, limited to the allegations surrounding Judge Doyle's alleged

conversation with the victim's family.  Prior to the beginning of

the hearing, the parties stipulated that a conversation took place

in the cafeteria of the Kane County judicial center, at which time

Judge Doyle and members of the victim's family were present and

that the conversation was of some duration, not merely a

conversation in passing.

     Don Zuelke, the assistant public defender representing the

defendant, testified that on June 15, 1994, after jury

deliberations began on the defendant's cause, he went into the

cafeteria.  He proceeded to sit at a table with Bill Catching, a

reporter with the Beacon News.  At the time, the cafeteria was

open, and members of the general public were present.  After a

while, Mr. Catching commented to him that Judge Doyle was sitting

in another part of the cafeteria with the victim's family.  At that

time, Mr. Zuelke looked over and observed Judge Doyle standing by

a table where several of the victim's "supporters" (people who had

been presented during the trial) were seated and talking to these

people.  He described the conversation as very amicable, friendly. 

Although he did not time it, he estimated that the conversation was

at least 15 minutes in length.  Mr. Zuelke subsequently learned

that one of the people at the table was the victim's husband when

he testified at the defendant's sentencing hearing.  He did not

make an objection to Mr. Oatman testifying, hoping that Judge Doyle

would say something, but Judge Doyle did not.  After speaking with

appellate counsel,  Mr. Zuelke raised the issue in the motion to

reduce sentence and the addition to the motion for a new trial. 

Mr. Zuelke noted that Judge Doyle had increased the defendant's

original sentence by five years.

     On cross-examination, Mr. Zuelke acknowledged that Judge Doyle

had based the additional five years on the defendant's activities

since the time of his first conviction.  

     On redirect examination, Mr. Zuelke testified that he has

learned that Mr. Oatman is a Kane County employee working in data

processing. 

     Will Nelson testified that he is a friend of Tom Oatman's and

that his (Nelson's) wife is the victim's best friend.  He was

present for the defendant's entire trial.  After the jury retired

to deliberate, Tom Oatman, Karen, the victim's sister, and he went

to the cafeteria.  While they were there, Judge Doyle came by and

spoke to them.  Mr. Nelson had met Judge Doyle previously at a

little league game.  Other than at the game, he had never spoken to

Judge Doyle.

     Mr. Nelson testified further that Judge Doyle recognized him,

said hello or something to that effect, and pulled up a chair,

sitting between the table at which Mr. Nelson was sitting and

another table.  Judge Doyle primarily spoke to Mr. Nelson.  They

spoke about little league baseball, that Judge Doyle had previously

been a sheriff, and that the judge's wife was attending or had just

finished law school.  Mr. Nelson asked who won the arguments at his

house.  Later, Mr. Nelson asked about the number of trials in Kane

County, and Judge Doyle remarked that there were a lot of trials in

Kane County.  Mr. Nelson brought Mr. Oatman into the conversation

by telling Judge Doyle that Mr. Oatman would agree with the judge.

     Mr. Nelson further testified that he did not introduce Mr.

Oatman to Judge Doyle nor did Mr. Oatman introduce himself to Judge

Doyle.  The defendant's case was never discussed.  There was no

indication that Judge Doyle knew who Mr. Oatman was.  The

conversation lasted about 20 minutes.  It ended when someone

announced that the jury was back.  

     Following argument, Judge Puklin denied the motion to reduce

sentence and the addition to the motion for a new trial, based upon

the allegations as to Judge Doyle's conduct.  Following a hearing

before Judge Doyle on the remaining allegations of the motion to

reduce sentence, Judge Doyle denied the motion, and this appeal

followed. 

     The defendant contends that Judge Doyle's conversation with

members of the victim's family created the appearance of

impropriety and that the judge's failure to recuse himself from

further proceedings in the defendant's cause entitles the defendant

to a new trial or, in the alternative, to a new sentencing hearing

before a different judge.

     At the outset, the State contends that by failing to raise the

issue at the time the jury returned its verdict or to object at the

time Tom Oatman testified at the sentencing hearing the defendant

has waived this issue for purposes of appeal.  People v. Enoch, 122

Ill. 2d 176 (1988) (preservation of an issue for purposes of appeal

requires both an objection at trial and a written post-trial

motion).  However, since this issue may impact on the sentence the

defendant received thus violating one of his fundamental rights, we

will consider the issue to determine if plain error was committed

here.  People v. Moncrief, 276 Ill. App. 3d 533, 535 (1995).

     A judge must make every effort to avoid the appearance of

impropriety during his activities that may reflect on his judicial

conduct.  People v. Dunigan, 96 Ill. App. 3d 799, 812 (1981). 

Private conversations concerning a case are impermissible, since a

defendant is unable to rebut information obtained from members of

the public and considered by the judge.  Dunigan, 96 Ill. App. 3d

at 812.  

     The facts in Dunigan are somewhat similar to the facts in the

present cause.  After the jury had reached a verdict in Dunigan's

case, the trial judge, at the invitation of an assistant State's

Attorney, had stopped at a tavern.  The victims in the cause

stopped by the judge's table for a few moments, discussed

generalities, and then left.  The meeting was by chance, and the

judge stated that he did not discuss Dunigan's sentence or the

outcome of the cause with the victims.  The assistant State's

Attorney confirmed the judge's recollection of the conversation.  

     In addressing Dunigan's argument that the judge's

"socializing" with the victims required him to recuse himself from

the sentencing procedures, the reviewing court noted that there was

no evidence that the judge considered or received any information

from the victims at their brief, unplanned encounter.  "The

question then becomes whether the trial judge was required to

recuse himself by virtue of the meeting itself, in the absence of

evidence that the case was discussed."  Dunigan, 96 Ill. App. 3d at

812.

     The Dunigan court relied on the supreme court decision in

People v. Hicks, 44 Ill. 2d 550 (1970).  In Hicks, our supreme

court held that a judge's conversation with an individual, who was

allegedly a relative of the victim and who went to the judge's

chambers of her own volition to obtain a front row seat in the

courtroom, did not supply cause for the judge's disqualification or

give rise to the probability of unfairness which might affect the

trial.  The Hicks court stated:

     "To say that any involuntary meeting or conversation, no

     matter how trivial, gives rise to disqualification would

     present too easy a weapon with which to harass the

     administration of criminal justice and to obtain a

     substitution of judges."  Hicks, 44 Ill. 2d at 557.

     The Dunigan court agreed with Hicks and held that the

involuntary meeting between the judge and the victims in that cause

did not, in and of itself, disqualify the judge from presiding at

Dunigan's sentencing hearing.  The Dunigan court stated further as

follows:

     "Our review of the record reveals no malice directed toward

     [Dunigan] by the trial judge as a result of his contact with

     the [victims], and it is unlikely that this single event

     resulted in such an increased level of emotional involvement

     as to make prejudice likely and disqualification necessary."

     Dunigan, 96 Ill. App. 3d at 813.

     In the cause before us, there was no evidence that the meeting

between Judge Doyle and the victim's family and supporters was

anything but a chance encounter.  There is also no evidence that

any details of the defendant's case were discussed during the

conversation, nor is there any evidence that this conversation

increased Judge Doyle's involvement with the case such that it

would influence him against the defendant.  Applying the analysis

set forth in Dunigan, we conclude that the defendant was not

entitled to a new trial or a new sentencing hearing before a

different judge.

     The defendant's reliance on People v. Bradshaw, 171 Ill. App.

3d 971 (1988), is misplaced.  In Bradshaw, during the trial, a

deputy sheriff, the mother of the victim, sent a note to the trial

judge, asking to see him.  Upon receiving the note, the trial judge

recessed the trial and met with the deputy sheriff in his chambers. 

According to the trial judge, after he ascertained what the deputy

sheriff's relationship to the cause was, he terminated the

conversation.  

     On appeal, the reviewing court held that the trial court

should have recused himself from the cause following his ex parte

conversation with the victim's mother.  The court noted that a

deputy sheriff is an officer of the court and plays an integral

role in the administration of justice.  There was evidence that

other persons witnessed the deputy sheriff pass the note to the

trial judge who was presiding over a cause in which her daughter

was the victim.  The witnesses also observed the trial judge enter

his chambers with the deputy sheriff.  Even if the conversation was

terminated as soon as the trial court realized the relationship of

the deputy sheriff to the cause before him, the reviewing court

concluded that the appearance of impropriety had already been

created.     

     Unlike the cause before us, in Bradshaw, the meeting was

deliberately sought by the deputy sheriff.  It was witnessed by

persons in the courtroom who knew the deputy sheriff was related to

the victim and who observed her go into chambers with the trial

judge.  The meeting took place in the judge's chambers, thus

conveying a secretive atmosphere to the meeting.  In contrast, in

the cause before us, the meeting was accidental and unplanned.  The

conversation took place in a public place.  The other participants

in the conversation were private citizens.  Finally, with the

exception of the assistant public defender, who might be expected

to take a different view, there was no testimony from other

individuals present in the cafeteria at the time the conversation

took place suggesting that even the appearance of impropriety was

created by Judge Doyle's conversation with the victim's family.

Even the assistant public defender did not raise the issue of the

conversation until after he spoke with appellate counsel.  The

defendant suggests that the failure to raise the issue earlier

resulted from his counsel's reluctance to "taint his relationship

with Judge Doyle in all future trials."   We are inclined to accord

that argument very little weight since, if it were true, it would

mean that the thought of displeasing a trial judge carries more

weight than presenting effective arguments on behalf of one's

client.  More importantly, however, the assistant public defender

did in fact raise the issue, as soon as he discovered it might be

an issue, and the presentation of the argument did result in what

we would generously describe as a lively discussion between Judge

Doyle and counsel for the defendant and the State.

     The defendant's reliance on People v. Mote, 255 Ill. App. 3d

757 (1994), is also misplaced.  In that cause, the trial judge,

with Mote's permission, conferred with the victims to determine

whether they would approve of Mote being sentenced to a term of

probation rather than four years' incarceration.  In determining

that Mote required a new sentencing hearing, the reviewing court

reaffirmed an earlier holding that private conversations between a

judge and members of the general public to assist the court in

determining the sentence to be imposed is reversible error.  Mote,

255 Ill. App. 3d at 760.  Again, in the cause before us, there is

no evidence that the conversation in question involved any aspect

of the defendant's cause.  

     A judge should avoid impropriety and the appearance of

impropriety in all of the judge's activities.  155 Ill. 2d R. 62. 

This rule implies that it is the judge who must initiate the course

of conduct which creates a disfavorable public impression.  People

v. Musso, 227 Ill. App. 3d 514, 518 (1992).  Although it appears

from Will Nelson's testimony that Judge Doyle initiated the

conversation in this cause, nevertheless, the evidence in this

cause fails to establish that the conversation in this cause

"created a disfavorable public impression."  No appearance of

impropriety was created by Judge Doyle's conduct in this cause.  We

conclude, therefore, that Judge Puklin did not err in denying the

defendant's motion for a new sentencing hearing and his motion for

a new trial based on additional matters based upon the conversation

between Judge Doyle and the victim's family.

     The defendant then contends that the increase in his sentence

from 30 years' to 35 years' imprisonment was improper.  The

defendant was convicted of aggravated criminal sexual assault, a

Class X felony.  See 720 ILCS 5/12--14 (West 1994).  The maximum

nonextended term of imprisonment for a Class X felony is 30 years'

imprisonment.  See 730 ILCS 5/5--8--1(a)(3) (West 1994).  The range

for an extended-term sentence for a Class X felony is between 30

and 60 years' imprisonment.  See 730 ILCS 5/5--8--2(a)(2) (West

1994).  

     The defendant's original sentence was 30 years' imprisonment,

the maximum nonextended term for the offense of aggravated criminal

sexual assault.  The 35-year sentence imposed by Judge Doyle

reflected an additional five years based upon the defendant's

conduct while he was incarcerated between his first and second

trials.  Judge Doyle relied on section 5--5--4 of the Unified Code

of Corrections (730 ILCS 5/5--5--4 (West 1994), which provides as

follows:

          "Where a conviction or sentence has been set aside on

     direct review or on collateral attack, the court shall not

     impose a new sentence for the same offense or for a different

     offense based on the same conduct which is more severe than

     the prior sentence less the portion of the prior sentence

     previously satisfied unless the more severe sentence is based

     upon conduct on the part of the defendant occurring after the

     original sentencing."

     The defendant seeks to distinguish People v. Rivera, 166 Ill.

2d 279 (1995).  In that cause our supreme court held that the trial

court could properly increase Rivera's original sentence of 60

years' imprisonment for first degree murder to 80 years'

imprisonment upon his retrial and conviction of the same offense

where Rivera had been convicted of unlawful use of a weapon in a

penal institution.  Rivera, 166 Ill. 2d at 294.  The defendant

argues that, unlike Rivera, he was never charged with or convicted

of a crime while incarcerated.  The defendant further argues that

only two of the incidents involved assaultive behavior; that Mr.

Forbes could not provide any details as to one of those incidents;

and that the defendant's good-time credits, lost as a result of

those two incidents, were, in fact, restored to the defendant. 

Finally, the defendant points out that the majority of the

"tickets" he received were for conduct not criminal in nature and

that he received them early in his incarceration.

     Section 5--5--4 permits a trial court to increase a

defendant's sentence based upon conduct occurring after the

original sentence.  Thus the trial court is not limited to

considering only criminal convictions or only conduct that rises to

the level of a criminal offense.  In Rivera, our supreme court

stated:

     "[The United States Supreme] Court in [North Carolina v.

     Pearce, 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969)]

     reasoned that: 'A trial judge is not constitutionally

     precluded, in other words, from imposing a new sentence,

     whether greater or less than the original sentence, in the

     light of events subsequent to the first trial that may have

     thrown new light upon the defendant's "life, health, habits,

     conduct, and mental and moral propensities." ' "  Rivera, 166

     Ill. 2d at 294.

An increased sentence after retrial may be proper if the court is

able to point to specific conduct on the part of defendants

occurring subsequent to their original sentencing, which warrants

a heavier sentence.  Rivera, 166 Ill. 2d at 294-95; People v. Baze,

43 Ill. 2d 298, 303 (1969).  The Rivera court noted that the

legislature incorporated the Pearce and Baze decisions in its

enactment of section 5--5--4.  Rivera, 166 Ill. 2d at 295.

     It is clear that, in imposing an increased sentence on the

defendant, the trial court relied on the testimony of Mr. Forbes

and the defendant's record of conduct while in the Department of

Corrections.  It is also clear that the trial court properly relied

on evidence showing, at the least, the defendant's unwillingness to

follow the rules of the institution he was confined to and, at the

worst, a propensity to violence.  The fact that the defendant later

did learn to follow the rules is commendable, but does not

eliminate his earlier violations from consideration by the trial

court.  We note also that, for his conviction of criminal conduct

while incarcerated, Rivera received an additional 20 years'

imprisonment while the defendant in this cause received only an

additional 5 years, even though at least one of his "tickets"

involved an attack on another inmate.   

     We conclude that the trial court properly increased the

defendant's sentence from 30 to 35 years' imprisonment based upon

his conduct following his original sentencing,

     In summary, we conclude that the defendant is not entitled to

a new trial or a new sentencing hearing.  We further determine that

the trial court properly increased the defendant's sentence to 35

years' imprisonment.

     The judgment of the circuit court of Kane County is affirmed. 

     Affirmed.

     GEIGER, P.J., and INGLIS, J., concur.