JOURNAL ENTRY and OPINION
{¶ 1} A jury found defendant Michel Abboud guilty of individual felony counts of kidnapping, aggravated robbery, aggravated burglary, and a misdemeanor count of coercion. The felony counts contained gun specifications. Although Abboud raises a number of issues on appeal, we find one to be dispositive — the court incorrectly charged the jury that the Abboud and his wife, Katia were accomplices and that their testimony should be viewed with caution.
 {¶ 2} The victims, Flavia DeSousa-Meza and Alcides Meza, were Spanish-speaking Argentine nationals. At the time of the offenses, the two were living together (they have since married) and were preparing to move back to Argentina as their visas had expired and they were staying in the United States illegally. Flavia worked as a housekeeper for Abboud, and on the day of the offenses, told Abboud's wife and co-defendant, Katia Abboud, that she was quitting at the end of the day. A short while later, Katia confronted Flavia and accused her of stealing money from a bank that had been kept in the closet. The bank allegedly held $5,000 in coins and bills.
 {¶ 3} Flavia denied taking any money. Katia emptied the contents of the bank and made Flavia count out the money. As Flavia counted the money, Abboud entered the house. After learning that Katia had accused Flavia of theft, Abboud placed a telephone call to the North Randall Police Department. Abboud often employed off-duty North Randall police officers as security guards in his business, and this apparently gave him some influence with members of the department. When the North Randall Police Department answered the call, Abboud identified himself simply as "Michel" and said that he wanted a sergeant to come to the house. When the sergeant arrived, Abboud told him that Flavia had stolen money. Abboud rejected the officer's offer to arrest Flavia, saying instead that Flavia's boyfriend Alcides would be bringing the money. The sergeant left the house.
 {¶ 4} Abboud then called for North Randall police officer Brad Dibacco. Dibacco arrived in full uniform and asked Flavia if she stole the money. Flustered by the theft accusation and conscious of how the police handled like-matters in her own country, Flavia agreed that she took the money. She was permitted to call Alcides and asked him for help. Alcides said Flavia told him it was either "money or jail." Katia grabbed the telephone away, and told Alcides that if Flavia did not return the money, she would not be able to go home. Katia directed Abboud to Flavia's purse and he took her keys. He and Dibacco picked up another person, co-defendant Michael Shaaya, and drove to Alcide's apartment. Katia remained with Flavia and prevented her from leaving.
 {¶ 5} In the meantime, Alcides frantically tried to raise money and managed to convince his employer to loan him $2,000. He then called friends to arrange a ride to the city of Westlake, where his employer lived. Going down to his apartment building parking lot to wait for his ride, Alcides saw Abboud, Dibacco and Shaaya arrive. Abboud had Flavia's keys and used them to let himself into the apartment. When Alcides tried to stop them, Dibacco put his hand on his holstered weapon and pushed Alcides aside. Dibacco then drew his weapon and entered the apartment. Abboud and Dibacco went through the packed bags (Alcides and Flavia were scheduled to depart for Argentina within two days) looking for money. Shaaya told Alcides that if he paid the money there would be no problem. Alcides wanted to talk to Flavia, but the men would not let him. He told them that he only had $500.
 {¶ 6} By this time, Alcides' friends arrived. They collectively testified that the contents of Alcides' luggage had been strewn across the apartment by the three men. One of the friends asked the officer if he had a search warrant to enter the premises, and Dibacco replied that he did not need a search warrant because he was going to cut a deal. Another friend heard Dibacco tell Alcides that he would go to jail if he did not repay the money that Flavia took. Throughout the time in the apartment, the friends said that the amount of money demanded by Abboud went from $1,500 to $3,000. All of the friends wanted to speak with Flavia to get her side of the story, but Abboud and Dibacco would not permit them to call. When one of the friends said that she was going to call the Cleveland Police, Dibacco said he would in turn call the FBI.
 {¶ 7} The parties then left to travel to Westlake. Abboud did not stop Alcides' friends from coming, and they formed a caravan. During this ride, Alcides gave Abboud the $500. During the ride to Westlake, one of the friends called the North Randall Police Department and spoke to the Executive Lieutenant Rose. She explained to Rose that a North Randall police officer was involved in a kidnapping. Rose said that he was unaware of any officer in that area and told the caller she should call 911 or the Cleveland Police Department and have them stop the car.
 {¶ 8} The Westlake Police Department then received a call informing them about a possible scam involving a police officer and Abboud. An officer was dispatched to stop the cars and found that something unusual was occurring. Panicking, Alcides told the police that his wife was being held by her employer because she had been accused of stealing and the employer was in the process of getting his money back. Dibacco did most of the talking for Abboud since Abboud said that he spoke very little English. Dibacco told the Westlake police that he was along to facilitate the transfer of money in order to settle a theft offense. When asked if a police report had been filed, Dibacco replied in the negative, saying that "things are done different on the east side." He told the Westlake police the Flavia was still at Abboud's house, but not being watched by a police officer. When the Westlake police asked how he could be sure that Flavia would not flee in the absence of a police officer, Dibacco said that he wasn't worried because "there was somebody watching her."
 {¶ 9} The Westlake police took everyone to the police station. Dibacco kept repeating that he was "fucked" and would lose his job over the incident. The Westlake police made several calls to the North Randall police to confirm Dibacco's employment and spoke with Rose. During the interval between calls, Rose found out that one of his sergeants had gone to the Abboud house and concluded that the Abbouds wished to give Flavia an opportunity to repay the money she allegedly stole. Upon hearing that Alcides was accusing the Abbouds of a possible kidnapping, Rose discretely dispatched two officers to the Abboud house. They returned with Flavia a short time later.
 {¶ 10} The Westlake police had a Spanish-speaking officer call the North Randall police station and speak with Flavia. The police recorded the telephone call. When asked to explain the situation, Flavia said "* * * the owner (of the house) said that $5,000 is missing, but that I only took $2,000." She also said that Katia had "told me to sit there and couldn't go anywhere." After being transported to Westlake, Flavia gave a written statement in which she claimed to have admitted telling the Abbouds that she took the money because she did not want to go to jail. She also told the Spanish-speaking officer that she did not take any money.
 {¶ 11} The Westlake police also questioned Abboud, and found him evasive. He could not respond to specific questions such as why Flavia was at the Abboud house when they needed to go to her apartment to get the money. The Westlake police found Alcides and Flavia's apartment key on Abboud, and they later confirmed that it worked the lock to their apartment. The police took Dibacco's police weapon and found it operable.
 {¶ 12} The Abbouds considered themselves the victims of a theft offense and characterized their efforts to obtain money from Flavia and Alcides as charitable in nature. They knew that both Flavia and Alcides were in the United States on expired visas, and if they were able to regain their money without police involvement, it would not have prevented any delay in the departure to Argentina. They further claimed that the city of Westlake had it out for them, as in 1982, one of their relatives had previous trouble in the city and had allegedly been warned that if he returned to the city, his "ass is grass." They also claimed that the Westlake officers made disparaging remarks about their ancestry.
 {¶ 13} Abboud argues that the court not only erred, but "severely devastated" the Abbouds testimonial credibility by telling the jury that the Abbouds were, in effect, "accomplices" and that as such their credibility was suspect and their own evidence should be viewed with caution. He maintains that the instruction on accomplice testimony applies only when the state is offering a co-defendant or accomplice to prove its case — not when it involves witnesses on behalf of the defense.
 {¶ 14} Both Abboud and his wife testified in their own defense, but not as a witness for the other. They gave consistent versions of the events leading to their arrest and charge. The court gave the following accomplice testimony instruction over strenuous objection by Abboud:
 {¶ 15} "Now, testimony of an accomplice. * * * You have heard testimony from Katia Abboud, another person who is accused of three of the crimes charged in this case and is said to be an accomplice.
 {¶ 16} "An accomplice is one who purposely and/or knowingly assists and/or joins another in the commission of a crime. Whether Katia Abboud is an accomplice and the weight to be given to her testimony are matters to be determined from all the facts and circumstances in evidence.
 {¶ 17} "The testimony of an accomplice that is supported by other evidence does not become inadmissible because of her complicity, moral turpitude or self-interest, but the admitted or claimed complicity of a witness may affect her credibility and make her testimony subject to grave suspicion and require that it be weighed with great caution."
 {¶ 18} The court later told the jury that "the testimony of an accomplice has also been read to you. In this instance, it was the testimony of Michel Abboud, and again, it will go with you."
 {¶ 19} The court's instruction tracked the accomplice instruction set forth in R.C. 2923.01(H)(2), which states:
 {¶ 20} "(2) If a person with whom the defendant allegedly has conspired testifies against the defendant in a case in which the defendant is charged with conspiracy and if the testimony is supported by other evidence, the court, when it charges the jury, shall state substantially the following:
 {¶ 21} "The testimony of an accomplice that is supported by other evidence does not become inadmissible because of the accomplice's complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect the witness' credibility and make the witness' testimony subject to grave suspicion, and require that it be weighed with great caution.
 {¶ 22} "It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."
 {¶ 23} As a general rule, the accomplice instruction is given in cases where the accomplice testifies as a state witness against the defendant. The United States Supreme Court has noted that "[i]n most instances, [accomplice instructions] represent no more than a commonsense recognition that an accomplice may have a special interest in testifying, thus casting doubt upon his veracity." Cool v. United States
(1972), 409 U.S. 100, 104; see, also, State v. Pearson (1980),62 Ohio St.2d 291, 293, fn. 2.
 {¶ 24} In the usual case, the courts have considered the issue of giving an accomplice instruction when the accomplice has pleaded guilty to a charge, testified as a witness for the defense and given exculpatory testimony. There does not appear to be a consensus on the propriety of an instruction under these circumstances. In Commonwealth v. Russell
(1978), 477 Pa. 147, 383 A.2d 866, the Supreme Court of Pennsylvania stated the objections to giving an accomplice instruction under those circumstances:
 {¶ 25} "A legitimate basis exists for charging the jury to view an accomplice's testimony with suspicion when the accomplice testifies for the Commonwealth. Such a witness, out of a reasonable expectation of leniency, has an interest in inculpating others. This basis is inapplicable, however, when the accomplice testifies on behalf of the defense. One implicated in a crime cannot reasonably expect such leniency by exonerating others, particularly where, as here, the witness has already been sentenced for committing the crime. Thus, it is unreasonable to infer, and improper for the court to charge, that because this defense witness stood convicted of the crime in question, his testimony must be viewed `with disfavor' and accepted only with `caution and care.'" See, also, State v. Begyn (1961), 34 N.J. 35, 167 A.2d 161.
 {¶ 26} Other courts, including the federal courts, take the position that a cautionary instruction on accomplice testimony is proper in all circumstances where an accomplice testifies. The rationale is that "[s]uch testimony on behalf of defendants is becoming more prevalent all the time, particularly by spouses or convicted friends of the accused who have nothing to lose by taking the blame." See State v. Anthony (1988),243 Kan. 493, 502, 749 P.2d 37, 44. See, also, People v. Rivera (1995),166 Ill.2d 279, 652 N.E.2d 307; United States v. Nolte (C.A.5),440 F.2d 1124; State v. Diaz (1988), 88 N.C. App. 699, 704, 365 S.E.2d 7,10; United States v. Morrone (E.D.Pa. 1980), 502 F. Supp. 983, 990-99, affirmed (C.A.3, 1981) 672 F.2d 904; United States v. Mitchell (D.C.C. 1974), 385 F. Supp. 1190, 1193.
 {¶ 27} In this case, the court gave the accomplice instruction when codefendants were tried in a joint trial and did not testify against the other. We have found no Ohio cases on point, but we believe the reasons not to give the instruction in such circumstances are manifest.
 {¶ 28} The accused is entitled to have the trial court give complete and accurate jury instructions on all of the issues raised by the evidence. State v. Williford (1990), 49 Ohio St.3d 247. R.C.2923.01(H)(2) plainly states that the instruction applies only when the person testifying does so "against" the defendant. Neither Abboud nor his wife testified against the other in the sense contemplated by the statute. They testified in their own behalf and were not called as witnesses by the other spouse. Moreover, R.C. 2923.01(H)(2) obviously contemplates that accomplice testimony be antagonistic to the accused, and nothing in the testimony of either Abboud or his wife could have been considered to be antagonistic to the other. They gave consistently exculpatory versions of events. By its express terms, the accomplice instruction set forth in R.C. 2923.01(H)(2) did not apply under the facts of this case.
 {¶ 29} The court's instruction on accomplice credibility was also objectionable on a broader level. The Sixth Amendment right "to offer testimony" is among "the most basic ingredients of due process of law."Washington v. Texas (1967), 388 U.S. 18, 19, quoting In re Oliver
(1948), 333 U.S. 257, 273. The accomplice instruction violated Abboud's right to testify in his own behalf because it unfairly told the jury that all of Abboud's testimony was suspect, even his testimony going to charges that did not involve Katia. See People v. Reed (1996),453 Mich. 685, 556 N.W.2d 858; Cruz v. People (1962), 149 Colo. 187,368 P.2d 774; State v. Land (1990), 14 Kan. App.2d 515, 794 P.2d 668;State v. Taylor (Fl.App. 1981), 402 So.2d 585.
 {¶ 30} In fact, unlike the instruction pertaining to Katia, the court's use of the word "accomplice" in its instructions relating to Abboud made any fact-finding something of a fait accompli for the jury. The court told the jury "the testimony of an accomplice has also been read to you. In this instance, it was the testimony of Michel Abboud * * *." The characterization of Abboud as an "accomplice" essentially found Abboud guilty of complicity before the jury had a chance to make that finding. This inappropriately shifted the fact-finding function from the jury to the judge. United States v. United States Gypsum Co. (1978), 438 U.S. 422, 446.
 {¶ 31} We find the court's error was prejudicial to Abboud. By labeling Abboud an accomplice, the court gave the jury no choice but to view his testimony with the gravest caution and suspicion. This cast a pall over his entire case, depriving him of a fair trial in violation of his right to present a defense. We therefore sustain the sixth assignment of error and remand for a new trial. Our disposition moots any consideration of the remaining assignments of error. See App.R. 12(A)(1)(c).
Reversed and remanded.
This cause is reversed and remanded for proceedings consistent with this opinion.
It is, therefore, considered that said appellant recover of said appellee his costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES J. SWEENEY, J., and TERRENCE O'DONNELL, J., CONCUR.