THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TRACY TAYLOR, Defendant-Appellant.

Second District    No. 2—95—0663

Opinion filed May 8, 1997.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

David R. Akemann, State's Attorney, of St. Charles (John X. Breslin and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RATHJE delivered the opinion of the court:

Following a jury trial, the defendant, Tracy Taylor, was convicted of one count of aggravated criminal sexual assault and was sentenced to a term of 30 years' imprisonment in the Department of Corrections. The defendant appealed, and this court reversed his conviction and remanded the cause for a new trial. See *People v. Taylor*, 244 Ill.

App. 3d 460 (1993). Following a second jury trial, the defendant was again convicted of aggravated criminal sexual assault and was sentenced to a term of 35 years' imprisonment.

The defendant appeals raising the following issues: whether the trial judge should have recused himself from all proceedings which occurred after the jury began deliberations; and whether the increase in the defendant's sentence from 30 to 35 years' imprisonment was improper.

On October 11, 1994, following the defendant's second conviction, the trial court held a sentencing hearing. The State called several witnesses to testify in aggravation.

Susan Dahl testified that, on January 18, 1990, she was working as a clerk in a convenience store when the defendant robbed the store. In the course of the robbery, the defendant slapped her in the face and told her that he had a gun.

Cameron Forbes, employed by the Illinois Department of Corrections in the records department, testified as to the defendant's penitentiary records for the time period between his two trials in this cause. Mr. Forbes explained that an inmate disciplinary report is referred to as a "ticket." There are major tickets, which would be for something like assaultive behavior, while a minor ticket would be for not reporting for school or being slow in locking up. Minor tickets are sent to the program unit, which is limited to enforcing minor discipline. Major tickets are sent to the adjustment committee, which has the latitude to dismiss the ticket or impose a proper punishment following a hearing. A major ticket would be any ticket where an inmate received a C grade demotion, a segregation placement, or a loss of good-conduct credits for the violation.

Mr. Forbes further testified that the records reflect that the defendant received one major ticket in his first six months of incarceration and nine thereafter. He also received 12 minor tickets during his incarceration. The records further reflected that the defendant lost good-time credits on two occasions. According to Forbes, of the major tickets the defendant received, it appeared that at least two were for assaultive behavior.

On cross-examination, Mr. Forbes testified that neither of the two incidents of assaultive behavior was directed against a correctional officer. He acknowledged that there was gang activity at the Menard facility, to which the defendant had been transferred from the Joliet facility, but denied that the gangs had more control over the day-to-day activities of the inmates than the guards. He further denied that fighting was very common at Menard or Joliet. Mr. Forbes acknowledged that the good-time credits that the defendant

lost as a result of those incidents were in fact restored to him as of January 22, 1992.

Mr. Forbes further testified that other "major" tickets that the defendant received were for giving extra meat to another inmate while the defendant was on the serving line; failing to complete an assigned detail; and being in a cell with another inmate where music was being played too loud. However, Mr. Forbes was unsure as to whether all these were included as major tickets in his total of nine for the defendant since in certain cases a minor punishment was imposed. Mr. Forbes did agree that the defendant had only been involved in two incidents of assaultive behavior since his incarceration.

Mr. Forbes further testified that the defendant's records showed no violations from November 1992 to November 1993 when he was returned to the Kane County jail to await his new trial. In addition, the records reflected that the defendant had received a "low risk" status and had been recommended by the warden for transfer to a less secure facility. The transfer was denied solely on the basis of the amount of time remaining to be served on the defendant's sentence.

On redirect examination, Mr. Forbes testified that, in one of the assault incidents, the defendant and two others jumped another inmate and began to beat him up. The defendant was also "ticketed" for stealing syrup, which the inmates would use to make alcohol. On re-cross-examination, Mr. Forbes testified that no criminal charges were placed against the defendant while he was in the Department of Corrections.

The trial court then questioned Mr. Forbes as to why the 30 days of good-time credit that the defendant lost as a result of the above assault incident were restored to him. Mr. Forbes explained that, under Department of Corrections' procedures, after a certain period of time has elapsed without similar conduct occurring, the good-time credit lost is restored to the inmate, unless the time was lost in conjunction with an escape in which case it is not restored.

Thomas Oatman testified that the victim and he were living together at the time of the offense; they are now married. He described the impact that the offense had on his working life as well as on the victim and their social life. At the time that the cause was remanded for a second trial, the victim received eight obscene telephone calls. The calls were traced to the Department of Corrections facility at Danville. Mr. Oatman denied knowing anyone at the Danville facility or that he gave anyone at the Danville facility his telephone number.

On cross-examination, Mr. Oatman acknowledged that he had a published telephone number.

The defense then called Stacy Taylor, the defendant's brother, and Marcia Green, the defendant's mother, to provide testimony in mitigation.

In argument following the testimony, the State urged the trial court to impose a longer sentence than had been originally imposed on the defendant based upon his conduct while incarcerated in the Department of Corrections. The defense responded that the original trial judge had found that the defendant was not subject to an extended-term sentence and instead had imposed the maximum nonextended-term sentence of 30 years' imprisonment on the defendant. Therefore, under the resentencing statute, the defendant's new sentence could not exceed the original sentence. The defense further argued that the incidents that the defendant was involved in while he was incarcerated were for the most part minor and occurred early in his incarceration.

In pronouncing sentence, the trial judge stated that the offense in this cause was the most brutal of its type that he had ever heard or seen. He specifically found that, based upon the testimony and the evidence, the offense here was accompanied by exceptionally brutal behavior and was indicative of wanton cruelty. The trial judge further found no basis for reducing the original sentence of 30 years' imprisonment. Citing the testimony regarding the defendant's conduct during his incarceration, the trial court found that it could impose a higher sentence than the original 30-year sentence. After considering the factors in aggravation and balancing them with the factors in mitigation, the trial court imposed a sentence of 35 years' imprisonment in the Department of Corrections.

On November 10, 1994, the defendant filed a motion to reduce his sentence. *Inter alia,* the motion alleged that the defendant's rights to due process were violated when the trial judge (hereinafter Judge Doyle) engaged in conversation with the victim's family during jury deliberations at the defendant's second trial. The motion further alleged that the violation was compounded by the fact that Thomas Oatman, one of the family members, subsequently testified at the defendant's sentencing hearing. The defendant also filed an addition to his motion for a new trial, which had already been denied on October 11, 1994, alleging the same due process violation. The case was transferred to Judge Barry Puklin for a hearing on those particular allegations.

On May 5, 1995, a hearing was conducted by Judge Puklin on the motion to reduce sentence and the addition to the motion for a new trial, limited to the allegations surrounding Judge Doyle's alleged conversation with the victim's family. Prior to the beginning of the

hearing, the parties stipulated that a conversation took place in the cafeteria of the Kane County judicial center, at which time Judge Doyle and members of the victim's family were present and that the conversation was of some duration, not merely a conversation in passing.

Don Zuelke, the assistant public defender representing the defendant, testified that on June 15, 1994, after jury deliberations began on the defendant's cause, he went into the cafeteria. He proceeded to sit at a table with Bill Catching, a reporter with the Beacon News. At the time, the cafeteria was open, and members of the general public were present. After a while, Mr. Catching commented to him that Judge Doyle was sitting in another part of the cafeteria with the victim's family. At that time, Mr. Zuelke looked over and observed Judge Doyle standing by a table where several of the victim's "supporters" (people who had been presented during the trial) were seated and talking to these people. He described the conversation as very amicable, friendly. Although he did not time it, he estimated that the conversation was at least 15 minutes in length. Mr. Zuelke subsequently learned that one of the people at the table was the victim's husband when he testified at the defendant's sentencing hearing. He did not make an objection to Mr. Oatman testifying, hoping that Judge Doyle would say something, but Judge Doyle did not. After speaking with appellate counsel, Mr. Zuelke raised the issue in the motion to reduce sentence and the addition to the motion for a new trial. Mr. Zuelke noted that Judge Doyle had increased the defendant's original sentence by five years.

On cross-examination, Mr. Zuelke acknowledged that Judge Doyle had based the additional five years on the defendant's activities since the time of his first conviction.

On redirect examination, Mr. Zuelke testified that he has learned that Mr. Oatman is a Kane County employee working in data processing.

Will Nelson testified that he is a friend of Tom Oatman's and that his (Nelson's) wife is the victim's best friend. He was present for the defendant's entire trial. After the jury retired to deliberate, Tom Oatman, Karen, the victim's sister, and he went to the cafeteria. While they were there, Judge Doyle came by and spoke to them. Mr. Nelson had met Judge Doyle previously at a little league game. Other than at the game, he had never spoken to Judge Doyle.

Mr. Nelson testified further that Judge Doyle recognized him, said hello or something to that effect, and pulled up a chair, sitting between the table at which Mr. Nelson was sitting and another table. Judge Doyle primarily spoke to Mr. Nelson. They spoke about little

league baseball, that Judge Doyle had previously been a sheriff, and that the judge's wife was attending or had just finished law school. Mr. Nelson asked who won the arguments at his house. Later, Mr. Nelson asked about the number of trials in Kane County, and Judge Doyle remarked that there were a lot of trials in Kane County. Mr. Nelson brought Mr. Oatman into the conversation by telling Judge Doyle that Mr. Oatman would agree with the judge.

Mr. Nelson further testified that he did not introduce Mr. Oatman to Judge Doyle nor did Mr. Oatman introduce himself to Judge Doyle. The defendant's case was never discussed. There was no indication that Judge Doyle knew who Mr. Oatman was. The conversation lasted about 20 minutes. It ended when someone announced that the jury was back.

Following argument, Judge Puklin denied the motion to reduce sentence and the addition to the motion for a new trial, based upon the allegations as to Judge Doyle's conduct. Following a hearing before Judge Doyle on the remaining allegations of the motion to reduce sentence, Judge Doyle denied the motion, and this appeal followed.

The defendant contends that Judge Doyle's conversation with members of the victim's family created the appearance of impropriety and that the judge's failure to recuse himself from further proceedings in the defendant's cause entitles the defendant to a new trial or, in the alternative, to a new sentencing hearing before a different judge.

At the outset, the State contends that by failing to raise the issue at the time the jury returned its verdict or to object at the time Tom Oatman testified at the sentencing hearing the defendant has waived this issue for purposes of appeal. *People v. Enoch*, 122 Ill. 2d 176 (1988) (preservation of an issue for purposes of appeal requires both an objection at trial and a written post-trial motion). However, since this issue may impact on the sentence the defendant received, thus violating one of his fundamental rights, we will consider the issue to determine if plain error was committed here. *People v. Moncrief*, 276 Ill. App. 3d 533, 535 (1995).

A judge must make every effort to avoid the appearance of impropriety during his activities that may reflect on his judicial conduct. *People v. Dunigan*, 96 Ill. App. 3d 799, 812 (1981). Private conversations concerning a case are impermissible, since a defendant is unable to rebut information obtained from members of the public and considered by the judge. *Dunigan*, 96 Ill. App. 3d at 812.

The facts in *Dunigan* are somewhat similar to the facts in the present cause. After the jury had reached a verdict in Dunigan's

case, the trial judge, at the invitation of an assistant State's Attorney, had stopped at a tavern. The victims in the cause stopped by the judge's table for a few moments, discussed generalities, and then left. The meeting was by chance, and the judge stated that he did not discuss Dunigan's sentence or the outcome of the cause with the victims. The assistant State's Attorney confirmed the judge's recollection of the conversation.

In addressing Dunigan's argument that the judge's "socializing" with the victims required him to recuse himself from the sentencing procedures, the reviewing court noted that there was no evidence that the judge considered or received any information from the victims at their brief, unplanned encounter. "The question then becomes whether the trial judge was required to recuse himself by virtue of the meeting itself, in the absence of evidence that the case was discussed." *Dunigan*, 96 Ill. App. 3d at 812.

The *Dunigan* court relied on the supreme court decision in *People v. Hicks*, 44 Ill. 2d 550 (1970). In *Hicks*, our supreme court held that a judge's conversation with an individual who was allegedly a relative of the victim and who went to the judge's chambers of her own volition to obtain a front row seat in the courtroom did not supply cause for the judge's disqualification or give rise to the probability of unfairness which might affect the trial. The *Hicks* court stated:

> "To say that any involuntary meeting or conversation, no matter how trivial, gives rise to disqualification would present too easy a weapon with which to harass the administration of criminal justice and to obtain a substitution of judges." *Hicks*, 44 Ill. 2d at 557.

The *Dunigan* court agreed with *Hicks* and held that the involuntary meeting between the judge and the victims in that cause did not, in and of itself, disqualify the judge from presiding at Dunigan's sentencing hearing. The *Dunigan* court stated further as follows:

> "Our review of the record reveals no malice directed toward [Dunigan] by the trial judge as a result of his contact with the [victims], and it is unlikely that this single event resulted in such an increased level of emotional involvement as to make prejudice likely and disqualification necessary." *Dunigan*, 96 Ill. App. 3d at 813.

In the cause before us, there was no evidence that the meeting between Judge Doyle and the victim's family and supporters was anything but a chance encounter. There is also no evidence that any details of the defendant's case were discussed during the conversation, nor is there any evidence that this conversation increased Judge Doyle's involvement with the case such that it would influence him

against the defendant. Applying the analysis set forth in *Dunigan*, we conclude that the defendant was not entitled to a new trial or a new sentencing hearing before a different judge.

The defendant's reliance on *People v. Bradshaw*, 171 Ill. App. 3d 971 (1988), is misplaced. In *Bradshaw*, during the trial, a deputy sheriff, the mother of the victim, sent a note to the trial judge, asking to see him. Upon receiving the note, the trial judge recessed the trial and met with the deputy sheriff in his chambers. According to the trial judge, after he ascertained what the deputy sheriff's relationship to the cause was, he terminated the conversation.

On appeal, the reviewing court held that the trial judge should have recused himself from the cause following his *ex parte* conversation with the victim's mother. The court noted that a deputy sheriff is an officer of the court and plays an integral role in the administration of justice. There was evidence that other persons witnessed the deputy sheriff pass the note to the trial judge who was presiding over a cause in which her daughter was the victim. The witnesses also observed the trial judge enter his chambers with the deputy sheriff. Even if the conversation was terminated as soon as the trial judge realized the relationship of the deputy sheriff to the cause before him, the reviewing court concluded that the appearance of impropriety had already been created.

Unlike the cause before us, in *Bradshaw*, the meeting was deliberately sought by the deputy sheriff. It was witnessed by persons in the courtroom who knew the deputy sheriff was related to the victim and who observed her go into chambers with the trial judge. The meeting took place in the judge's chambers, thus conveying a secretive atmosphere to the meeting. In contrast, in the cause before us, the meeting was accidental and unplanned. The conversation took place in a public place. The other participants in the conversation were private citizens. Finally, with the exception of the assistant public defender, who might be expected to take a different view, there was no testimony from other individuals present in the cafeteria at the time the conversation took place suggesting that even the appearance of impropriety was created by Judge Doyle's conversation with the victim's family. Even the assistant public defender did not raise the issue of the conversation until after he spoke with appellate counsel. The defendant suggests that the failure to raise the issue earlier resulted from his counsel's reluctance to "taint his relationship with Judge Doyle in all future trials." We are inclined to accord that argument very little weight since, if it were true, it would mean that the thought of displeasing a trial judge carries more weight than presenting effective arguments on behalf of one's client.

More importantly, however, the assistant public defender did in fact raise the issue, as soon as he discovered it might be an issue, and the presentation of the argument did result in what we would generously describe as a lively discussion between Judge Doyle and counsel for the defendant and the State.

The defendant's reliance on *People v. Mote*, 255 Ill. App. 3d 757 (1994), is also misplaced. In that cause, the trial judge, with Mote's permission, conferred with the victims to determine whether they would approve of Mote being sentenced to a term of probation rather than four years' incarceration. In determining that Mote required a new sentencing hearing, the reviewing court reaffirmed an earlier holding that private conversations between a judge and members of the general public to assist the court in determining the sentence to be imposed are reversible error. *Mote*, 255 Ill. App. 3d at 760. Again, in the cause before us, there is no evidence that the conversation in question involved any aspect of the defendant's cause.

A judge should avoid impropriety and the appearance of impropriety in all of the judge's activities. 155 Ill. 2d R. 62. This rule implies that it is the judge who must initiate the course of conduct that creates a disfavorable public impression. *People v. Musso*, 227 Ill. App. 3d 514, 518 (1992). Although it appears from Will Nelson's testimony that Judge Doyle initiated the conversation in this cause, nevertheless, the evidence in this cause fails to establish that the conversation in this cause "created a disfavorable public impression." No appearance of impropriety was created by Judge Doyle's conduct in this cause. We conclude, therefore, that Judge Puklin did not err in denying the defendant's motion for a new sentencing hearing and his motion for a new trial based on additional matters based upon the conversation between Judge Doyle and the victim's family.

■ The defendant then contends that the increase in his sentence from 30 years' to 35 years' imprisonment was improper. The defendant was convicted of aggravated criminal sexual assault, a Class X felony. See 720 ILCS 5/12—14 (West 1994). The maximum nonextended term of imprisonment for a Class X felony is 30 years' imprisonment. See 730 ILCS 5/5—8—1(a)(3) (West 1994). The range for an extended-term sentence for a Class X felony is between 30 and 60 years' imprisonment. See 730 ILCS 5/5—8—2(a)(2) (West 1994).

The defendant's original sentence was 30 years' imprisonment, the maximum nonextended term for the offense of aggravated criminal sexual assault. The 35-year sentence imposed by Judge Doyle reflected an additional five years based upon the defendant's conduct while he was incarcerated between his first and second trials. Judge Doyle relied on section 5—5—4 of the Unified Code of Corrections (730 ILCS 5/5—5—4 (West 1994)), which provides as follows:

"Where a conviction or sentence has been set aside on direct review or on collateral attack, the court shall not impose a new sentence for the same offense or for a different offense based on the same conduct which is more severe than the prior sentence less the portion of the prior sentence previously satisfied unless the more severe sentence is based upon conduct on the part of the defendant occurring after the original sentencing."

■ The defendant seeks to distinguish *People v. Rivera*, 166 Ill. 2d 279 (1995). In that cause our supreme court held that the trial court could properly increase Rivera's original sentence of 60 years' imprisonment for first degree murder to 80 years' imprisonment upon his retrial and conviction of the same offense where Rivera had been convicted of unlawful use of a weapon in a penal institution. *Rivera*, 166 Ill. 2d at 294. The defendant argues that, unlike Rivera, he was never charged with or convicted of a crime while incarcerated. The defendant further argues that only two of the incidents involved assaultive behavior; that Mr. Forbes could not provide any details as to one of those incidents; and that the defendant's good-time credits, lost as a result of those two incidents, were, in fact, restored to the defendant. Finally, the defendant points out that the majority of the "tickets" he received were for conduct not criminal in nature and that he received them early in his incarceration.

Section 5—5—4 permits a trial court to increase a defendant's sentence based upon *conduct* occurring after the original sentence. Thus the trial court is not limited to considering only criminal convictions or only conduct that rises to the level of a criminal offense. In *Rivera*, our supreme court stated:

"[The United States Supreme] Court in [*North Carolina v. Pearce*, 395 U.S. 711, 723, 23 L. Ed. 2d 656, 668, 89 S. Ct. 2072, 2079 (1969),] reasoned that: 'A trial judge is not constitutionally precluded, in other words, from imposing a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's "life, health, habits, conduct, and mental and moral propensities." ' " *Rivera*, 166 Ill. 2d at 294.

An increased sentence after retrial may be proper if the court is able to point to specific conduct on the part of defendants occurring subsequent to their original sentencing, which warrants a heavier sentence. *Rivera*, 166 Ill. 2d at 294-95; *People v. Baze*, 43 Ill. 2d 298, 303 (1969). The *Rivera* court noted that the legislature incorporated the *Pearce* and *Baze* decisions in its enactment of section 5—5—4. *Rivera*, 166 Ill. 2d at 295.

It is clear that, in imposing an increased sentence on the defendant, the trial court relied on the testimony of Mr. Forbes and the

defendant's record of conduct while in the Department of Corrections. It is also clear that the trial court properly relied on evidence showing, at the least, the defendant's unwillingness to follow the rules of the institution he was confined to and, at the worst, a propensity to violence. The fact that the defendant later did learn to follow the rules is commendable, but does not eliminate his earlier violations from consideration by the trial court. We note also that, for his conviction of criminal conduct while incarcerated, Rivera received an additional 20 years' imprisonment while the defendant in this cause received only an additional 5 years, even though at least one of his "tickets" involved an attack on another inmate.

We conclude that the trial court properly increased the defendant's sentence from 30 to 35 years' imprisonment based upon his conduct following his original sentencing.

In summary, we conclude that the defendant is not entitled to a new trial or a new sentencing hearing. We further determine that the trial court properly increased the defendant's sentence to 35 years' imprisonment.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

GEIGER, P.J., and INGLIS, J., concur.