April 29, 1999

NO. 4-97-0540

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from

Plaintiff-Appellee,          ) Circuit Court of

          v. ) McLean County

KEVIN CHILDS,      ) No. 92CF1065

          Defendant-Appellant. ) 

              ) Honorable

                    )    Luther H. Dearborn,

                               )    Judge Presiding.

_________________________________________________________________

JUSTICE GARMAN delivered the opinion of the court:  

Defendant Kevin Childs was convicted after a jury trial in the circuit court of McLean County of residential burglary (720 ILCS 5/19-3 (West 1992)), aggravated unlawful restraint (720 ILCS 5/10-3.1 (West 1992)), two counts of aggravated criminal sexual assault (720 ILCS 5/12-14 (West 1992)), and violation of an order of protection (720 ILCS 5/12-30 (West 1992)).  He was sentenced to consecutive terms of imprisonment totalling 55 years.  He now appeals, claiming (1) the evidence was not sufficient to convict him of the various offenses beyond a reasonable doubt, (2) the testimony of his public defender from his first trial violated attorney-client privilege, (3) he was denied a fair trial by the excusing of the only African-American juror for cause, and (4) his increased sentence following a second trial is the product of judicial vindictiveness.  We affirm.

I.  BACKGROUND

Defendant was previously convicted of the same offenses.  His conviction was overturned by this court in 
People v. Childs
, 

278 Ill. App. 3d 65, 662 N.E.2d 161 (1996), because the trial court did not substantially comply with Supreme Court Rule 401(a) (134 Ill. 2d R. 401(a)) regarding admonishments upon waiver of counsel.  At the second trial, defendant was represented by counsel.

Bloomington police officer Fred Martin testified that he was dispatched to the home of the victim, C.G., at approximately 10 p.m. on December 21, 1992, to check on the welfare of the resident.  He found the back door forced open and personal effects, such as a purse and wallet, on the floor.  No one was at home.

Officer Henry Craft testified that he was dispatched to the same address at approximately 5 a.m. the following morning, after C.G. reported that she had been kidnapped and sexually assaulted by defendant, her former boyfriend.  When Craft arrived, C.G. was crying and upset.  He sent C.G. to the hospital in the company of a female officer and stayed to secure the premises.

Michael Ripsch, now a retired Bloomington police officer, testified he was sent to room 147 of a local motel on December 22, 1992, to locate and arrest defendant.  He knocked on the door and defendant answered.  As soon as the door opened, Ripsch saw "a large knife 
laying [
sic
] on the floor."  
He immediately stepped on the knife to prevent defendant from reaching it and placed defendant, who did not resist, under arrest.   

Police sergeant Randall McKinley testified he investi­

gated the crime scenes at C.G.'s home and the motel.  He identified several photographs taken at the home, including one of the back door "with a piece of trim broken off."  
At the motel room, he found one bed "in pristine condition" and one "roughed up and mussed."
  A knife was on the floor at the foot of the unmade bed.  
McKinley identi­fied the knife he found in the motel room.  The knife and several photo­graphs of both locations were admitted into evidence.

   On cross-examination, McKinley described the clothing found on a chair at the victim's home as neatly folded.  He agreed that an empty beer can with a hole punctured in the side and burn marks on it was found in the motel room and that such cans are typically used for smoking crack cocaine.

 
 C.G. testified that several weeks before the incident she obtained an order of protection against defendant.  She identified a copy of the order, which prohibited him from having contact with her and from coming to her home.  When C.G. came home at about 8 p.m. on December 21, 1992, she noticed her back door had been forced open.  She turned to run but defendant appeared from inside the house, grabbed her, pulled her inside, and threw her against the refriger­ator.  She dropped a briefcase and another bag she had been carrying.  C.G. stated she saw a large knife on the kitchen table.  She identified the knife previously identified by McKinley as the one she had seen on the table.  It was not one of her knives.  Defendant did not pick up the knife, but it was within his reach.  C.G. testified that defendant was angry and repeatedly threatened to kill her.  He insisted she remove all of her clothing so that she would not try to run away.  She folded her clothing and placed it on a chair.  

At this point, the trial was recessed until the following morning.  On the morning of the second day of trial, one of the jurors, A.M., sent a note to the trial court, asking to be excused.  In her note, she stated she knew the defendant, his family, the complaining witness, and "was friends with almost everyone waiting outside the courtroom."
  She concluded, after hearing the first day's testimony, that there was "no way possible [for her] to be open[-]minded and fair in this trial."  In addition, she wrote that after she obtained an order of protection, her ex-husband broke into her home with the intent to harm her.  Although she at first thought it would be easy to set aside her personal feelings, she "thought it out thoroughly last night" and was no longer sure she could be an impartial juror.

At the request of both defense counsel and the State, A.M. was questioned.  She acknowledged it was "unfortunate" she was the only African-American in the entire jury pool.  She explained that she had not said anything about her familiarity with the defendant during 
voir
 
dire
 because she did not know him as Kevin.  She had always known him by a nickname and did not make the connection until after testimony began.  When questioned by defense counsel, A.M. expressed concern that she might be unfair to the defendant because "hearing what little bit I heard, *** it's just too identical *** to my own situation."  The State asked that A.M. be excused for cause.  Defense counsel requested she be kept on the jury, specifically mentioning his concern that she was the only black juror.  The trial court excused A.M. for cause and she was replaced by an alternate juror, resulting in an all-white jury.  Both defendant and C.G. are African-American.  

When C.G. resumed testifying, she stated that after she removed her clothing, she and defendant moved into the living room.  He threatened to kill her if she had been with another man.  She begged him not to kill her.  He turned on her cassette tape recorder, explaining he wanted her to be able to hear herself begging.  The phone rang and the answering machine picked up the call.  It was defendant's mother, saying she knew defendant was there and asking him to call her.  Defendant called her back and C.G. heard him tell his mother "everything is okay" and he was not going to hurt C.G.   His mother called a second time and C.G. called her back at defendant's request.  He told her to tell his mother everything was all right.  C.G. did as she was told but his mother "was not convinced *** and said she was going to call the police anyway." 

Defendant then took her upstairs.  There was a knock at the front door.  It was Fred Childs, defendant's brother.  C.G. "hollered down and told him he's not here," but Fred said he knew defendant was there.  Defendant went to the door while C.G. remained on the stairs, still unclothed.  She heard Fred say his mother had called the police.  Fred left.  Defendant told her to get dressed, that 
they were leaving.  On their way out of the house, he took the knife.  He continued to threaten to kill her.

C.G. gave defendant her car keys.  He drove.  The knife was in his right jacket pocket and she was sitting to his right.  Defendant drove to a house she did not recognize and told her to get out of the car.  She did not try to run because she was afraid of him.  She knew he could catch her if she tried to get away because she had once tried to run away from him and he caught her and beat her.  They were inside the house for about half an hour.  She knew no one and did not speak.  She was always within arm's reach of defendant.  

As they drove to a gas station, she could see the handle of the knife in his pocket.  They went inside and he bought some beer.  Again, she did not seek assistance because she was afraid he would kill her.  Then they drove to the motel.  She went to the registration desk and he stood behind her.  She assumed he still had the knife.  She checked in, using her credit card, and asked for a room in the back, as defendant instructed.  C.G. did not try to signal to the clerk that she needed help.  

When they got to the room, defendant brought out the knife and set it on the television table.  He told her to undress and said that if she could have sex with another man, she could have sex with him.  She told him she would do whatever he wanted.  Defendant drank the beer.  They had intercourse and oral sex.  The knife was three or four feet away the entire time. 

Finally, at about 4:30 a.m., defendant told her she could leave.  C.G. drove around in her car for awhile, then returned to her house and called a friend and the police.  

C.G. testified she was too frightened to remain in her house so she stayed somewhere else.  About five days after the incident, when she returned to her house to get some clothing and her tape player, she discovered the tape.  After she listened to it, she took it to the police.  She identified the cassette and the transcript, which were admitted into evidence over defendant's objection.  On the tape, C.G. could be heard begging for her life and defendant repeatedly threatening to kill her and himself.

On cross-examination, C.G. stated that in the motel room defendant used the knife to cut a hole in a beer can to make a device to smoke cocaine.  She smoked some with him at his request.    The trial court denied defendant's motion for a directed verdict.  Defense witness Ronald (Josh) Davis, defendant's nephew, testified that defendant and C.G. came to his home on the night of December 21, 1992.  Defendant drank part of a beer and took the can with him.  C.G. did not seem upset.  He did not see a knife.  On cross-examination, he could not describe what they were wearing.

Fred Childs, defendant's brother, testified that C.G. answered the door when he came to her home on the night of the incident.  She said defendant was not there, but Fred insisted on seeing his brother.  Defendant then came out onto the porch and told Fred that he and C.G. were just talking.  C.G. came to the door and asked defendant if he was going to be much longer.

Defendant's mother, Violet Singleton, testified she learned defendant was at C.G.'s house when he called her home looking for his brother.  She told him to "get out [of] that woman's house."  Singleton said that when she spoke to C.G., she sounded "kind of nervous" and she told her she was going to call the police.  When Singleton called the house again and got no answer, she did call the police.  She stated she received a phone call from C.G. at about 3:30 the next morning and C.G. sounded "happy and jolly."  She did not speak to her son, but heard him in the background "telling her what to ask."

Defendant testified that he was drinking vodka on the afternoon of December 21, 1992, with his supervisor, Michael Smith.  He got the knife from Smith because he was going to go to the "drug area" to get some cocaine and "when I am intoxicat­ed I always grab a weapon."  He bought and used some cocaine and "ended up going over to [C.G.]'s house."  He remem­bered being in the house, but not breaking through the door.  He made some phone calls, including a call to his mother.  As he sat at the kitchen table, he used the knife to make a "cocaine hitter" out of a cardboard tube.  When he heard C.G. come in, he met her at the door and "started cursing her out."  
He grabbed her.  She was "talking as if she was afraid," but he "didn't know why."  He did not tell her to take off her clothes.  She undressed in the living room and put on a robe.  According to defendant, she then initiated oral sex.  

They left the house after his brother's visit because he did not want to be disturbed by his mother or found by the police while using cocaine.  As they left, he noticed the knife on the table and remembered it was his, so he picked it up.  He put the knife in the backseat of the car.  They went to his nephew's house and then to a drug house, but no one was home.  He bought some crack cocaine on the street and then they went to the gas station.  The knife was still in the car when C.G. went with him into the station to buy drinks, gum, and cigarettes to take to the motel.  She was laughing and talking with him.  When she checked into the motel, he asked her to get a room in back, just out of habit.  He always gets a back room because "[n]ormally I will be hiding from my girlfriend."  Defendant took the knife into the room to use it to make a cocaine hitter from a beer can.  They smoked cocaine together and talked for a long time.  He was tired, but she initiated sex.  She fell asleep, and he stayed awake so he could wake her in time for her to go to work.  As she left, C.G. offered to take him home or to return at noon to bring him some food.  He called C.G. at home to see that she had gotten home safely and to tell her not to bother coming back to get him.  Then the police arrived and arrested him.

On cross-examination, defendant stated he did not make the tape recording.  He denied ever telling anyone he had done so.  Defense counsel objected to questions regarding defendant's statements to Amy Davis, the public defender who represented him earlier, "boast[ing] to her about making that tape so [C.G.] could *** hear how stupid she sounded."  The State argued defendant waived his attorney-client privilege when he filed a 
pro
 
se
 motion with attached documents, including Davis' notes documenting the conversation in question.  The trial court overruled the objection, finding the privilege waived with regard to "anything he filed in the court file."  The trial court noted that defendant denied making the statement to Davis and the State, therefore, would have to impeach his testimony.  

Defendant stated he did not recognize the knife identi­

fied by C.G. and the officer.  He testified he carried a butter knife that night and another knife with a blue handle.  He usually carries a knife with him when he has been drinking because people have attacked him "[f]or no reason at all."  He stated he frequent­

ly makes threats when he is drunk, including threats to kill people.  C.G. knows this and knows not to take him seriously.  Defendant admitted that after they arrived at the motel, he asked C.G. if she was afraid.  He insisted her answer was "no" and denied telling Davis that her answer was "yes."

Davis was then called as a rebuttal witness by the State.  She explained to the trial court that defendant had filed a complaint with the Attorney Registration and Disciplinary Commis­

sion (ARDC) against her and she disclosed the notes in her response to the complaint.  With that exception, she considered the conversation privileged.  The trial court ruled that defendant waived the privilege when he attached copies of the notes to his 
pro
 
se
 motion and provided a copy of the motion to the State.

Davis testified defendant told her he had made the tape recording because he wanted to show C.G. how stupid she sounded as she begged for her life.  She also testified that defendant said he asked C.G. at the motel if she was afraid.  He stated he put the knife down when she answered "yes."  

The jury rendered guilty verdicts on five of the six charges, finding defendant not guilty of aggravated kidnapping.  Two motions for new trial were filed, one by defense counsel and one by defendant 
pro
 
se
.  At the sentencing hearing, counsel made an oral motion to withdraw based on two incidents.  The previous evening, counsel went to the jail to speak with defendant.  Defendant began yelling at him and a corrections officer "got in between" them.  According to counsel, defendant "took a poke and jabbed me in the face" before the officer removed him from the room.  Counsel also stated that when defendant was brought into the courtroom that morning, he kicked counsel in the ear.  In addition, counsel declined to argue defendant's 
pro
 
se
 motion for a new trial, which alleged ineffective assistance of counsel.

The State objected to defense counsel's withdrawal, noting defendant's "history of running through his attorneys."  Defendant indicated he did not want defense counsel to continue to represent him.  He requested appointment of other counsel, but stated he would represent himself if he were not granted new counsel.  The trial court refused to appoint counsel and admonished defendant as to the nature of the charges, the minimum and maximum sentences for each, the possibility of consecutive sentences, and his right to counsel in accordance with Supreme Court Rule 401(a) (134 Ill. 2d R. 401(a)).  Defendant denied striking or attempting to strike counsel, but admitted pointing his finger in counsel's face.  Defendant then stated, "And today I kicked him in his ear."  The trial court allowed defendant to proceed 
pro
 
se
 and required defense counsel to remain as standby counsel.  The trial court denied defendant's "Motion for Judge Outside the Eleventh Judicial Circuit to Hear 
Pro
 
Se
 Motion for New Tri­al," defendant's request for a continuance, and both motions for a new trial.

The trial court then turned to the issue of sentencing.  The State offered no evidence and requested the same sentences that had been imposed after the first trial.  Defendant asked that he be sentenced to the minimum term for each count.  After acknowledging the general rule that a greater sentence may not be imposed on resentencing, the trial court noted an exception where intervening conduct by the defendant warrants an increased sentence.  In light of defendant's acknowledged kicking of defense counsel and "the conduct last night as to which there is a difference of opinion, but at least there were threatening gestures," the trial court sentenced defendant to serve consecutive terms totalling 55 years:  10 years for residential burglary, 5 years for aggravated unlawful restraint, and 20 years for each count of aggravated criminal sexual assault.  Following the first trial, the aggregate sentence was 37 years (5 years, 2 years, and two 15-year terms).  The written sentencing order indicates the "increased terms on resentence are per 730 ILCS 5/5-5-4."  Defendant did not file a motion to reconsider sentence.

II.  REASONABLE DOUBT

The material in this section is not to be pub­lished pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

[Material omitted is not to be published pursuant to Supreme Court Rule 23.]

III.  ATTORNEY-CLIENT PRIVILEGE

Davis is one of two public defenders who represented defendant at his first trial.  Defendant's request to dismiss Davis was initially denied but, later, she was allowed to withdraw.  He subsequently filed a complaint against Davis with the ARDC.  Her response to the complaint included photocopies of her notes documenting her conversations with defendant, including his statement that he turned on the tape recorder in C.G.'s home.  When defendant filed a 188-page 
pro
 
se
 motion for substitution of judges in his second trial, he attached copies of Davis' notes.

Defendant argues he is entitled to a new trial because of "constitutional error" resulting from Davis' testimony because he did not make a "knowing and intelligent waiver" of the attorney-

client privilege.  He claims her testimony "severely preju­diced him in front of the jury and destroyed any chance he had of being believed by the jurors." 

The purpose of the attorney-client privilege "is to secure for the client the ability to confide freely and fully in his or her attorney, without fear that confidential information will be disseminated to others."  
People v. Knuckles
, 165 Ill. 2d 125, 130, 650 N.E.2d 974, 976 (1995).  Defendant cites 
Knuckles
 in support of his argument that the attorney-client privilege should not be eroded by a public-interest exception, where applying the privilege would effectively deprive the trial court of a valuable witness.  Defendant is correct that 
Knuckles
 rejected such an exception, holding "that the attorney-client privilege must prevail despite its effect of withholding relevant information from the fact finder."  
Knuckles
, 165 Ill. 2d at 144, 650 N.E.2d at 983.  In the present case, however, the State did not seek to breach the privilege on the basis of public interest; rather, the State argued defendant waived the privilege.

A client's communications, made in confidence to his or her legal advisor, are permanently protected from disclosure unless the privilege is waived.  
People v. Adam
, 51 Ill. 2d 46, 48, 280 N.E.2d 205, 207 (1972).  However, "[a]ny disclosure by the client is inherently inconsistent with the policy of facilitating a confidential attorney-client relationship and, therefore, must result in a waiver of the privilege."  
Fidelity & Casualty Co. v. Mobay Chemical Corp.
, 252 Ill. App. 3d 992, 1000-01, 625 N.E.2d 151, 157 (1992).

In the present case, former counsel disclosed confiden­

tial information to the ARDC.  Defendant does not argue that Davis' disclosure to the ARDC was improper.  Indeed, the rules of professional conduct permit a lawyer to "use or reveal" a "[cli

ent's] confidences or secrets necessary to *** defend the lawyer *** against an accusation of wrongful conduct."  155 Ill. 2d R. 1.6(c)(3).  Defendant subsequently disclosed that information in his 
pro
 
se
 motion by attaching photocopies of Davis' notes to his motion and serving a copy of the motion on the State.  The State, thus, became aware of defendant's prior admission of having turned on the recorder, not directly from Davis or from her response to the ARDC, but as a result of defendant's own actions.  

Defendant characterizes the State's waiver argument as "technical" and argues he did not make a knowing and intelli­gent waiver.  At oral argu­ment, counsel suggested the trial court should have admonished him regarding waiver of the privilege but, in response to a question from the panel, agreed that any such admonishment would have had to occur after the fact.  

The State cites 
People v. Brown
, 275 Ill. App. 3d 1105, 1108-09, 657 N.E.2d 642, 645 (1995), in which defendant's former attorney testified that the defendant, Leroy Brown, was the same person identified as Gerald Bailey in a letter from the attorney that was found at the crime scene.  The court found that defendant had previously appeared in open court with the attorney and used the name Gerald Bailey.  "By doing so," the court held, "any privilege as to his identity and his relationship with [the attorney] were revealed to the public."  
Brown
, 275 Ill. App. 3d at 1110, 657 N.E.2d at 646.  The court commented, "That which is once made public is incapable of being secret again."  
Brown
, 275 Ill. App. 3d at 1110, 657 N.E.2d at 646.  Thus, even had the trial court admonished defendant regarding waiver at any time after he filed his 
pro
 
se
 motion, withdrawal of the motion would not have restored the privilege.  

Our own research supports the State's position.  In 
People v. O'Banner
, 215 Ill. App. 3d 778, 575 N.E.2d 1261 (1991), the defendant was convicted of the murder of her husband.  Her conviction was overturned on appeal because the State failed to call her trial counsel as a witness at the hearing on her motion for a new trial.  
O'Banner
, 215 Ill. App. 3d at 793, 575 N.E.2d at 1270.  Defendant and her son testified at the hearing that they told their respective attorneys he fired the fatal shot and her admissions to police were made in an effort to protect him.  Defense counsel, nevertheless, did not call the son to testify and advised defendant not to testify on her own behalf.  The State did not call trial counsel to refute this testimony or explain why he did not call the son.  
O'Banner
, 215 Ill. App. 3d at 791, 575 N.E.2d at 1269.  The court held:

"Where a defendant has asserted ineffec­

tive assistance of counsel and thereby put in issue the substance of communications between herself and her attorney, the defendant has waived the attorney-client privilege, and it is not error for the trial court to allow counsel to testify as to conversations with the defendant.  [Citations.]

In addition, where a defendant has taken the stand and testified as to portions of conversations with her attorney, this conduct amounts to a waiver of the attorney-client privilege as to the remainder of the conversa­

tion or communication about the same subject.  In such a situation, it is proper for the trial court to allow the attorney to be called and examined about the substance of these conversations."  
O'Banner
, 215 Ill. App. 3d at 793, 575 N.E.2d at 1270.

In addition, we note the State did not seek to introduce evidence of defendant's statements to Davis in its case in chief.  Defendant testified in his own behalf and, on cross-examina­tion, denied that he had turned on the recorder.  Davis' testimony was offered by the State merely to impeach defendant's statement that he did not activate the tape recorder.

We hold that defendant waived the attorney-client privilege with respect to his statements to Davis about the making of the tape when he attached copies of her notes to his motion, which then became a matter of public record.  The trial court properly allowed Davis to be questioned with regard to the relevant statements.

IV.  EXCUSING OF JUROR FOR CAUSE

The material in this section is not to be pub­lished pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

[Material omitted is not to be published pursuant to Supreme Court Rule 23.]
  

V.  INCREASED SENTENCE FOLLOWING RETRIAL

Defendant's final argument is that his 55-year sentence violates section 5-5-4 of the Unified Code of Corrections (Code):

"Where a conviction or sentence has been set aside on direct review or on collateral attack, the court shall not impose a new sentence for the same offense or for a differ­

ent offense based on the same conduct which is more severe than the prior sentence *** unless the more severe sentence is based upon conduct on the part of the defendant occurring after the original sentencing."  730 ILCS 5/5-5-4 (West 1996).  

Defendant does not deny kicking trial counsel and that this fact "could have been considered" by the trial court in imposing sentence.  Defendant argues on appeal that an 18-year increase in his aggregate sentence is an "overreaction" to his conduct.  He also argues it is not possible to ascertain how much of the increase was predicated on the kicking incident and how much was based on the confrontation between defendant and counsel the night before, about which there was some dispute.  At oral argument, counsel characterized the 55-year sentence as "incredibly harsh" and argued the trial court erred by failing to admonish defendant that his admitting the kicking incident would affect his sentencing in this case.

The State asserts that defendant has forfeited any claim of error because he did not object to the trial court's reliance on his actions against his attorney as a basis for increasing his sentence.  We decline to find the issue forfeited when the same attorney who would have been required to make the objection is the person defendant had just kicked in the ear.  For the same reason, we will review defendant's claim of error despite his failure to file a postsentencing motion.

We reject defendant's claim that the trial court was required to conduct an evidentiary hearing into the altercation that took place in the jail the evening before the hearing.  As the remarks of the trial court make clear, the trial court was aware of defendant's and counsel's differing versions of the event.  The trial court proceeded on the premise that the confrontation involved "at least" the threatening gestures admitted by defen­dant.  The record is also clear that the trial court did not base its sentenc­ing decision on counsel's description of that event.

In 
People v. Taylor
, 288 Ill. App. 3d 21, 679 N.E.2d 847 (1997), 
appeal
 
denied
, 174 Ill. 2d 589, 686 N.E.2d 1171 (1997), the court affirmed an increase in sentence from 30 to 35 years, based on "defendant's conduct while he was incarcerated between his first and second trials."  
Taylor
, 288 Ill. App. 3d at 30, 679 N.E.2d at 853.  
Taylor
 held that section 5-5-4 of the Code "permits a trial court to increase a defendant's sentence based upon 
conduct
 occurring after the original sentence" (emphasis in original) (
Taylor
, 288 Ill. App. 3d at 31, 679 N.E.2d at 854) and, thus, the trial court is not limited to considering only criminal convictions or conduct that rises to the level of a criminal offense.  

In 
Taylor
, defendant's intervening violent conduct, including two incidents of assaultive behavior against a correc­

tional officer, resulted in a five-year increase in his sentence.  
Taylor
, 288 Ill. App. 3d at 23, 679 N.E.2d at 849.  He had committed no additional violations during the 12 months preceding his return to the county jail to await his new trial.  
Taylor
, 288 Ill. App. 3d at 24, 679 N.E.2d at 849.  In affirming the five-year increase in sentence, the court noted that "[t]he fact that the defendant later did learn to follow the rules is commendable, but does not eliminate his earlier violations from consideration by the trial court."  
Taylor
, 288 Ill. App. 3d at 32, 679 N.E.2d at 854. 

Unlike the situation in 
Taylor
, where the defendant subsequently demonstrated a willingness and ability to restrain his violent impulses, defendant's assaultive behavior occurred on the very day of sentencing and in the courthouse.  Because this conduct occurred on public property, it constitutes aggravated battery.  720 ILCS 5/12-4(b)(8) (West 1996).  Similarly, defendant's threatening gestures toward his attorney, necessitating the intervention of a guard, occurred on public property.  As such, it constitutes aggravated assault.  720 ILCS 5/12-2(a)(9) (West 1996).   The trial court relied on "specific conduct on the part of defendant[] occurring subsequent to [his] original sentencing, which warrants a heavier sentence."  
Taylor
, 288 Ill. App. 3d at 31, 679 N.E.2d at 854.  Defendant's admitted conduct showed, "at the least, [his] unwillingness to follow the rules of the institu­

tion he was confined to and, at the worst, a propensity to violence."  
Taylor
, 288 Ill. App. 3d at 32, 679 N.E.2d at 854.  In addition, if the conduct in 
Taylor
, which was attenuated by the passage of more than one year with no further incidents, justified an increase of 5 years, an 18-year increase in the length of the aggregate sentence in the instant case is not an abuse of discre­

tion.  

Finally, each of the increased sentences was within the statutory range for the offense and the longer sentences for residential burglary, a Class 1 felony (720 ILCS 5/19-3(b) (West 1992)), and aggravat­ed criminal sexual assault, a Class X felony (720 ILCS 5/12-14(d) (West 1992)), were less than the maximum sentences (730 ILCS 5/5-8-1(a)(4), (a)(3) (West 1992
)).  The increased sentences were, there­fore, not the result of judicial vindictive­ness.

VI.  CONCLUSION

In summary, we conclude that the defendant is not entitled to a new trial or a new sentencing hearing.  We further determine that the trial court properly increased defendant's sentence from 37 to 55 years' imprisonment.

The judgment of the circuit court of McLean County is affirmed.

Affirmed.

STEIGMANN and MYERSCOUGH, JJ., concur.